# The Americans With Disabilities Act: Applying Performance And Conduct Standards To Employees With Disabilities

## TABLE OF CONTENTS

I. Introduction

II. Basic Legal Requirements

III. Application of ADA Legal Requirements to Performance and Conduct Standards

    A. Performance standards

    B. Conduct standards

    C. Questions pertaining to both performance and conduct issues

    D. Seeking medical information when there are performance or conduct problems

    E. Attendance issues

    F. Dress codes

    G. Alcoholism and illegal use of drugs

    H. Confidentiality issues arising from granting reasonable accommodation to avoid performance or conduct problems

    I. Legal enforcement

### Notice Concerning The Americans With Disabilities Act Amendments Act Of 2008

On September 25, 2008, President George W. Bush signed into law the ADA Amendments Act of 2008. See the list of specific changes to the ADA made by the ADA Amendments Act. As a result of this new legislation, which will go into effect on January 1, 2009, minor changes have been made to this document. These changes are found in endnotes 5 and 11 and do not affect the overall content or guidance in this document.

## I. INTRODUCTION

A core function for any supervisor is managing employee performance. Performance management, if done effectively, can help avoid discrimination, in addition to furthering an employer's business objectives. "Performance management systems that involve explicit performance expectations, clear performance standards, accurate measures, and reliable performance feedback, and the consistent application of these standards [to all employees], help to reduce the chances of discriminatory ratings."[1] Additionally, employees work most effectively when they clearly understand what is expected of them and know that their performance will be measured against a standard that is fair and applied even-handedly. The same principles apply to workplace rules concerning employee conduct.

Title I of the Americans with Disabilities Act (ADA) and Section 501 of the Rehabilitation Act, which prohibit employment discrimination against qualified individuals with disabilities, generally do not impinge on the right of employers to define jobs and to evaluate their employees according to consistently applied standards governing performance and conduct. Under both laws, employees with disabilities must meet qualification standards that are job-related and consistent with business necessity and must be able to perform the "essential functions" of the position, with or without reasonable accommodation.

Although, an employee's disability typically has no bearing on performance or conduct, sometimes an individual's disability may contribute to performance or conduct problems. When this is the case, a simple reasonable accommodation often may be all that is needed to eliminate the problem. However, EEOC continues to receive questions from both employers and employees about issues such as what steps are appropriate where a disability is causing – or seems to be causing – a performance or conduct problem, when a request for accommodation should be made, and when an employer can properly raise the issue of

This publication discusses relevant ADA requirements, provides practical guidance, and offers examples to demonstrate the responsibilities of both employees and employers when performance and conduct issues arise. It also discusses the role of reasonable accommodation in preventing or addressing performance or conduct problems, including the relationship between reasonable accommodation and disciplinary action and the circumstances in which an accommodation may or may not have to be granted.[2] Many of the examples in this document are based on actual cases or on specific scenarios presented to EEOC, and many of the points of "practical guidance" respond to questions received from both employers and individuals with disabilities.

## II. BASIC LEGAL REQUIREMENTS

Title I of the ADA covers private, state, and local government employers with 15 or more employees; Section 501 of the Rehabilitation Act of 1973 covers federal agencies. The statutes contain identical anti-discrimination provisions.[3]

The ADA prohibits discrimination against applicants and employees who meet the statute's definition of a "qualified individual with a disability."[4] The ADA defines a **"disability"** in three ways:

- A physical or mental impairment that substantially limits one or more of the major life activities of an individual

- A record of such an impairment

- Being regarded as having such an impairment.[5]

A **"qualified"** individual with a disability can (1) satisfy the requisite skill, experience, education and other job-related requirements and (2) perform the essential functions of a position with or without reasonable accommodation.[6]

**Job-related requirements**, also known as **"qualification standards,"** may include the following:

- Possessing specific training

- Possessing specific licenses or certificates

- Possessing certain physical or mental abilities (e.g., meeting vision, hearing, or lifting requirements; showing an ability to run or climb; exercising good judgment)

- Meeting health or safety requirements

- Demonstrating certain attributes such as the ability to work with other people or to work under pressure.[7]

Most jobs require that employees perform both "essential functions" and "marginal functions." The **"essential functions"** are the most important job duties, the critical elements that must be performed to achieve the objectives of the job. Removal of an essential function would fundamentally change a job. Marginal functions are those tasks or assignments that are tangential and not as important.[8]

If an applicant or employee cannot meet a specific qualification standard because of a disability, the ADA requires that the employer demonstrate the importance of the standard by showing that it is "job-related and consistent with business necessity."[9] This requirement ensures that the qualification standard is a legitimate measure of an individual's ability to perform an essential function of the specific position the individual holds or desires.[10] If an employer cannot show that a particular standard is "job-related and consistent with business necessity," the employer cannot use the standard to take an adverse action against an individual with a disability.

Employers may have to provide a **"reasonable accommodation"** to enable an individual with a disability to meet a qualification standard that is job-related and consistent with business necessity to perform the essential functions of her position.[11] A reasonable accommodation is any change in the work environment or in the way things are customarily done that enables an applicant or employee with a disability to enjoy equal employment opportunities. An employee generally has to request accommodation, but does not have to use the term "reasonable accommodation," or even "accommodation," to put the employer on notice. Rather, an employee only has to say that she requires the employer to provide her with an adjustment or change at work due to a medical condition.[12] An employer never has to provide an accommodation that would cause undue hardship, meaning significant difficulty or expense, which includes removing an essential function of the job.[13]

## III. APPLICATION OF ADA LEGAL REQUIREMENTS TO PERFORMANCE AND CONDUCT STANDARDS

Employers typically establish job-related requirements, the specific tasks or assignments that an employee must perform, and methods to evaluate performance. Evaluation criteria might take into account how well an employee is performing both essential and marginal functions and whether the employee is meeting basic job requirements (e.g., working well with others or serving customers in a professional manner). Employers might also enforce conduct standards (e.g., rules prohibiting destruction of company property or the use of company computers to access pornography). Certain performance and conduct standards will apply to all employees working for a company, organization, or government agency; others might only apply to certain offices or jobs within an entity.

A. Performance standards

**1. May an employer apply the same quantitative and qualitative requirements for performance of essential functions to an employee with a disability that it applies to employees without disabilities?**

Yes. An employee with a disability must meet the same production standards, whether quantitative or qualitative, as a non-disabled employee in the same job.[14] Lowering or changing a production standard because an employee cannot meet it due to a disability is not considered a reasonable accommodation.[15] However, a reasonable accommodation may be required to assist an employee in meeting a specific production standard.

- *Practical Guidance: It is advisable for employers to give clear guidance to an employee with a disability (as well as all other employees) regarding the quantity and quality of work that must be produced and the timetables for producing it.*

Example 1: A federal agency requires all of its investigators to complete 30 investigations per year in addition to other responsibilities. Jody's disability is worsening, causing her increased difficulty in completing 30 investigations while also conducting training and writing articles for a newsletter. Jody tells her supervisor about her disability and requests that she be allowed to eliminate the marginal functions of her job so that she can focus on performing investigations. After determining that conducting trainings and writing articles are marginal functions for Jody and that no undue hardship exists, the agency reassigns Jody's marginal functions as a reasonable accommodation.

Example 2: Robert is a sales associate for a pharmaceutical company. His territory covers a 3-state region and he must travel to each state three times a year. Due to staff cutbacks, the company is increasing the number of states for each salesperson from three to five. Robert explains to his manager that due to his disability he cannot handle the extra two states and the increased traveling, and he asks that he be allowed to have responsibility only for his original three states. The company may refuse this request for accommodation because it conflicts with the new production standard. However, the company should explore with Robert whether there is any reasonable accommodation that could enable him to service five states, and if not,

whether reassignment is possible.

<u>Example 3</u>: A computer programmer with a known disability has missed deadlines for projects, necessitating that other employees finish his work. Further, the employee has not kept abreast of changes in the database package, causing him to misinterpret as system problems changes that he should have known about. The employee is placed on a Performance Improvement Plan, but his performance does not improve and he is terminated. At no time does the employee request a reasonable accommodation (<u>i.e.</u>, inform the employer that he requires an adjustment or change as a result of a medical condition). The termination is justified as long as the employer holds the employee to the same performance standards as other programmers.[16]

## 2. May an employer use the same evaluation criteria for employees with disabilities as for employees without disabilities?

Yes. An employer should evaluate the job performance of an employee with a disability the same way it evaluates any other employee's performance.[17]

- *Practical Guidance: An accurate assessment of the employee's performance may, in some cases, alert the employee that his disability is contributing to the problem. This may lead the employee to request reasonable accommodation to address the problem and improve performance, which can benefit both the employee and the employer.[18]*

<u>Example 4</u>: Last year Nicole received an "above average" review at her annual performance evaluation. During the current year Nicole had to deal with a number of medical issues concerning her disability. As a result, she was unable to devote the same level of time and effort to her job as she did during the prior year. She did not request reasonable accommodation (<u>i.e.</u>, inform the employer that she requires an adjustment or change as a result of a medical condition). The quantity and quality of Nicole's work were not as high and she received an "average" rating. The supervisor does not have to raise Nicole's rating even though the decline in performance was related to her disability.[19]

## 3. May a supervisor require that an employee with a disability perform a job in the same manner as a non-disabled employee?

Not necessarily. In many instances, an essential function can be performed in different ways (including with reasonable accommodation). An employee who must use an alternative method of performance because of a disability must be evaluated accordingly.[20] However, an employer is not required to allow use of an alternate method that would impose an undue hardship.

<u>Example 5</u>: One of Rhoda's essential functions is providing training. Because she is deaf and, as a result, has difficulty speaking, Rhoda uses a sign language interpreter to voice for her. Generally, Rhoda's supervisor evaluates his employees on the use of their voices – whether they speak with a monotone or use their voices to show interest and enthusiasm. Rhoda's presentation cannot be measured in this way. However, there are alternative ways to measure how she conveys her message, including body language, facial expression, and the words she uses.

<u>Example 6</u>: Daniel works as a millwright, and an essential function of his job is repairing and maintaining equipment. Most of the equipment is accessible only by climbing ladders and steps. Due to a recent disability, Daniel no longer can climb and must work only at ground level. The location of the equipment does not allow alternative means to elevate Daniel (<u>e.g.</u>, using a cherry picker). With no reasonable accommodation possible, Daniel cannot repair the equipment (an essential function). Daniel is not "qualified" to remain in this position and the employer should explore whether it can reassign him as a reasonable accommodation.[21]

## 4. If an employer gives a lower performance rating to an employee and the employee responds by revealing she has a disability that is causing the performance problem, may the employer still give the lower rating?

Yes. The rating reflects the employee's performance regardless of what role, if any, disability may have played. [See Example 4.]

- *Practical Guidance: If an employee states that her disability is the cause of the performance problem, the employer could follow up by making clear what level of performance is required and asking why the employee believes the disability is affecting performance. If the employee does not ask for an accommodation (the obligation generally rests with the employee to ask), the employer may ask whether there is an accommodation that may help raise the employee's performance level.[22]*

## 5. Must an employee with a disability ask for a reasonable accommodation at a certain time?

No. The ADA does not compel employees to ask for accommodations at a certain time.[23] Employees may ask for reasonable accommodation before or after being told of performance problems. Sometimes, an employee may not know or be willing to acknowledge that there is a problem requiring accommodation until the employer points out deficiencies in performance.

- *Practical Guidance: Ideally, employees will request reasonable accommodation before performance problems arise, or at least before they become too serious.[24] Although the ADA does not require employees to ask for an accommodation at a specific time, the timing of a request for reasonable accommodation is important because an employer does not have to rescind discipline (including a termination) or an evaluation warranted by poor performance.[25]*

Example 7: Nasser, an employee at a nonprofit organization, recognizes soon after he begins working that he is having difficulty following conversations at meetings because of his deteriorating hearing. Nasser's hearing aid helps him when talking directly to one person, but not when he is in a large room with many people participating in a discussion. Nasser believes that he could follow the group discussions if the employer provided a portable assistive listening device. He tells his supervisor that a simple assistive listening system would include an FM transmitter and microphone that could be placed at the center of a conference table and an FM receiver and headset that he would wear. The system would amplify speakers' voices over the headset without affecting the way other meeting participants would hear the conversation. The employer provides the reasonable accommodation and Nasser now performs all of his job duties successfully.

Example 8: A county government employee does not disclose her chronic fatigue syndrome, even when she begins having performance problems that she believes are disability-related. Her supervisor counsels her about the performance problems, but they persist. The supervisor warns that if her work does not show improvement within the next month, she will receive a written warning. At this point, the employee discloses her disability and asks for reasonable accommodation.

The supervisor should discuss the request and how the proposed accommodation will help improve the employee's performance. The supervisor also may ask questions or seek medical documentation that the employee has a disability. The supervisor does not need to rescind his oral warning or his requirement that the employee's performance must improve. However, delaying the one-month period to evaluate the employee's performance pending a decision on her request for reasonable accommodation will enable the employer to assess the employee's performance accurately.

Example 9: An employee with a small advertising firm has a learning disability. Because the employee had a bad experience at a prior job when he requested accommodation, he decides not to disclose his disability or ask for any accommodations during the application process or once he begins working. Performance problems soon arise, and the employee's supervisor brings them to the employee's attention. He tries to solve the problems on his own, but cannot. The firm follows its policy on counseling and disciplining employees who are failing to meet minimum

Case 1:16-cv-03422-CCB   Document 21-2   Filed 03/28/17   Page 6 of 32

The employer may refuse the request for reasonable accommodation and proceed with the termination because an employer is not required to excuse performance problems that occurred prior to the accommodation request. Once an employer makes an employee aware of performance problems, the employee must request any accommodations needed to rectify them. This employee waited too long to request reasonable accommodation.[26]

## 6. What should an employer do if an employee requests an accommodation for the first time in response to counseling or a low performance rating?

When an employee requests a reasonable accommodation in response to the employer's discussion or evaluation of the person's performance, the employer may proceed with the discussion or evaluation but also should begin the "interactive reasonable accommodation process" by discussing with the employee how the disability may be affecting performance and what accommodation the employee believes may help to improve it.[27] Employers cannot refuse to discuss the request or fail to provide a reasonable accommodation as punishment for the performance problem. If a reasonable accommodation is needed to assist an employee in addressing a performance problem, and the employer refuses to provide one, absent undue hardship, the employer has violated the ADA.

The employer may seek appropriate medical documentation to learn if the condition meets the ADA's definition of "disability," whether and to what extent the disability is affecting job performance, and what accommodations may address the problem.[28] The employer may also suggest possible accommodations.[29]

The employee may need reasonable accommodation, for example, to enable him to meet a production standard or to perform an essential function. Where a lower performance rating results from an inability to perform a marginal function because of the disability, the appropriate accommodation would be to remove the marginal function (and perhaps substitute one that the employee can perform).

- *Practical Guidance: Employers find the "interactive process" helpful in clarifying what accommodation an employee is seeking and how it would help to correct a performance problem. The topics for discussion will vary depending on what information an employer requires to respond to a request for reasonable accommodation, but failing to raise questions may leave an employer at a disadvantage in making an informed decision. Furthermore, an employer might learn that alternative accommodations may be effective in meeting the employee's needs.*

When an employee does not give notice of the need for accommodation until after a performance problem has occurred, reasonable accommodation does not require that the employer:

- tolerate or excuse the poor performance;
- withhold disciplinary action (including termination) warranted by the poor performance;
- raise a performance rating; or
- give an evaluation that does not reflect the employee's actual performance.[30]

Example 10: Odessa does not disclose her learning disability, even when she begins having performance problems that she believes are disability-related. Her supervisor notices the performance problems and counsels Odessa about them. At this point, Odessa discloses her disability and asks for a reasonable accommodation. The supervisor denies the request immediately, explaining, "You should not have waited until problems developed to tell me about your disability." Odessa's delay in requesting an accommodation does not justify the employer's refusal to provide one. If a reasonable accommodation will help improve the employee's performance (without posing an undue hardship), the accommodation must be provided.[31]

Example 11: A federal employee is put on a 60-day Performance Improvement Plan (PIP). In

response, the employee requests a reasonable accommodation. The supervisor postpones the start of the PIP and immediately discusses the request with the employee, enlisting the agency's

Disability Program Manager (DPM) in the interactive process. The supervisor and DPM determine that a reasonable accommodation might help address the employee's performance problems. The supervisor arranges for the reasonable accommodation and the 60-day PIP commences.

The employer did not have to cancel the PIP because reasonable accommodation never requires excusing poor performance or its consequences. However, the fact that the employee did not ask for an accommodation until being placed on a PIP does not relieve the agency of its obligation to provide reasonable accommodation if the employee has a disability and an accommodation will help improve her performance.[32]

The temporary postponement of the PIP to process the request for a reasonable accommodation ensures that, if a reasonable accommodation is needed, the employee will have an equal opportunity to improve her performance.[33] If the employer determines that the employee is not entitled to a reasonable accommodation (e.g., the employee does not have a "disability"), the employee should be so informed and the PIP should begin.

Requests for reasonable accommodation should be handled expeditiously, in particular because unnecessary delays in determining or providing an effective accommodation may violate the ADA.[34] In this Example the supervisor recognized the need to address the request promptly so as not to unnecessarily delay the commencement of the PIP.[35]

- *Practical Guidance: An employer may need to determine what happens to an employee while it is handling a request for accommodation. For example, an employer might require an employee to perform only those functions of the job for which accommodation is not needed while processing the request. In other situations, it may be appropriate for an employee to take leave.*

## 7. May an employer withdraw a telework arrangement or a modified schedule provided as a reasonable accommodation because the employee is given an unsatisfactory performance rating?

No. An employer may not withdraw a reasonable accommodation as punishment for the unsatisfactory performance rating. Simply withdrawing the telework arrangement or a modified schedule is no different than discontinuing an employee's use of a sign language interpreter or assistive technology as reasonable accommodations.

Nor should an employer assume that an unsatisfactory rating means that the reasonable accommodation is not working. The employer can proceed with the unsatisfactory rating but may also wish to determine the cause of the performance problem to help evaluate the effectiveness of the reasonable accommodation. If the reasonable accommodation is not assisting the employee in improving his performance as intended, the employer and employee may need to explore whether any changes would make the accommodation effective, whether an additional accommodation is needed, or whether the original accommodation should be withdrawn and another should be substituted.[36]

B. Conduct standards

## 8. May an employer discipline an employee with a disability for violating a conduct standard?

Yes. If an employee's disability does not cause the misconduct, an employer may hold the individual to the same conduct standards that it applies to all other employees. In most instances, an employee's disability will not be relevant to any conduct violations.

Example 12: A blind employee has frequent disputes with her supervisor. She makes personal phone calls on company time, despite being told to stop. She routinely walks away from the job to smoke a cigarette despite warnings that she can do so only on breaks. She taunts the

Case 1:16-cv-03422-GCB Document 21-2 Filed 03/23/17 Page 8 of 32

Example 13: Coworkers frequently taunt an employee with cerebral palsy because of his speech impediment, but the supervisor neither knows nor has reason to know about the taunting. Instead of reporting the coworkers' behavior to his supervisor or human resources department, the employee goes into the offices of his coworkers and destroys some of their property. The employer may discipline the employee for his inappropriate response. (Because management is now aware of the coworkers' actions, it must promptly investigate to determine whether they constitute harassment. If so, the employer must take appropriate action to prevent future harassment.)

## 9. If an employee's disability causes violation of a conduct rule, may the employer discipline the individual?

Yes, if the conduct rule is job-related and consistent with business necessity and other employees are held to the same standard.[38] The ADA does not protect employees from the consequences of violating conduct requirements even where the conduct is caused by the disability.[39]

The ADA generally gives employers wide latitude to develop and enforce conduct rules. The only requirement imposed by the ADA is that a conduct rule be job-related and consistent with business necessity when it is applied to an employee whose disability caused her to violate the rule.[40] Certain conduct standards that exist in all workplaces and cover all types of jobs will always meet this standard, such as prohibitions on violence, threats of violence, stealing, or destruction of property.[41] Similarly, employers may prohibit insubordination towards supervisors and managers and also require that employees show respect for, and deal appropriately with, clients and customers.[42] Employers also may:

- prohibit inappropriate behavior between coworkers (e.g., employees may not yell, curse, shove, or make obscene gestures at each other at work);[43]

- prohibit employees from sending inappropriate or offensive e-mails (e.g., those containing profanity or messages that harass or threaten coworkers); using the Internet to access inappropriate websites (e.g., pornographic sites, sites exhibiting crude messages, etc.); and making excessive use of the employer's computers and other equipment for purposes unrelated to work;

- require that employees observe safety and operational rules enacted to protect workers from dangers inherent in certain workplaces (e.g., factories with machinery with accessible moving parts);[44] and

- prohibit drinking or illegal use of drugs in the workplace. [See Question 26.]

Whether an employer's application of a conduct rule to an employee with a disability is job-related and consistent with business necessity may rest on several factors, including the manifestation or symptom of a disability affecting an employee's conduct, the frequency of occurrences, the nature of the job, the specific conduct at issue, and the working environment. These factors may be especially critical when the violation concerns "disruptive" behavior which, unlike prohibitions on stealing or violence, is more ambiguous concerning exactly what type of conduct is viewed as unacceptable.[45] The following examples illustrate how different results may follow from application of these factors in specific contexts.

Example 14: Steve, a new bank teller, barks, shouts, utters nonsensical phrases, and makes other noises that are so loud and frequent that they distract other tellers and cause them to make errors in their work. Customers also hear Steve's vocal tics, and several of them speak to Donna, the bank manager. Donna discusses the issue with Steve and he explains that he has Tourette Syndrome, a neurological disorder characterized by involuntary, rapid, sudden movements or vocalizations that occur repeatedly. Steve explains that while he could control the tics sufficiently during the job interview, he cannot control them throughout the work day; nor can he modulate his voice to speak more softly when these tics occur. Donna lets Steve continue working for another two weeks, but she receives more complaints from customers and other

tellers who, working in close proximity to Steve, continue to have difficulty processing transactions. Although Steve is able to perform his basic bank teller accounting duties, Donna terminates Steve because his behavior is not compatible with performing the essential function of serving customers and his vocal tics are unduly disruptive to coworkers. Steve's termination is permissible because it is job-related and consistent with business necessity to require that bank tellers be able to (1) conduct themselves in an appropriate manner when serving customers[46] and (2) refrain from interfering with the ability of coworkers to perform their jobs. Further, because Steve never performed the essential functions of his job satisfactorily, the bank did not have to consider reassigning him as a reasonable accommodation.[47]

Example 15: Steve works as a bank teller but his Tourette Syndrome now causes only infrequent throat clearing and eye blinks. These behaviors are not disruptive to other tellers or incompatible with serving customers. Firing Steve for these behaviors would violate the ADA because it would not be job-related and consistent with business necessity to require that Steve refrain from minor tics which do not interfere with the ability of his coworkers to do their jobs or with the delivery of appropriate customer service.

Example 16: Assume that Steve has all the severe tics mentioned in Example 14, but he now works in a noisy environment, does not come into contact with customers, and does not work close to coworkers. The environment is so noisy that Steve's vocalizations do not distract other workers. Steve's condition would not necessarily make him unqualified for a job in this environment.

Example 17: A telephone company employee's job requires her to spend 90% of her time on the telephone with coworkers in remote locations, discussing installation of equipment. Due to her company's code of conduct requires workers to be respectful towards coworkers. Due to her psychiatric disability, the employee walks out of meetings, hangs up on coworkers on several occasions, and uses derogatory nicknames for coworkers when talking with other employees.[48] The employer first warns the employee to stop her unacceptable conduct, and when she persists, issues a reprimand. After receiving the reprimand, the employee requests a reasonable accommodation. The employee's antagonistic behavior violated a conduct rule that is job-related and consistent with business necessity and therefore the employer's actions are consistent with the ADA. However, having received a request for reasonable accommodation, the employer should discuss with the employee whether an accommodation would assist her in complying with the code of conduct in the future.

Example 18: Darren is a long-time employee who performs his job well. Over the past few months, he is frequently observed talking to himself, though he does not speak loudly, make threats, or use inappropriate language. However, some coworkers who are uncomfortable around him complain to the division manager about Darren's behavior. Darren's job does not involve customer contact or working in close proximity to coworkers, and his conversations do not affect his job performance. The manager tells Darren to stop talking to himself but Darren explains that he does so as a result of his psychiatric disability. He does not mean to upset anyone, but he cannot control this behavior. Medical documentation supports Darren's explanation. The manager does not believe that Darren poses a threat to anyone, but he transfers Darren to the night shift where he will work in relative isolation and have less opportunity for advancement, saying that his behavior is disruptive.

Although the coworkers may feel some discomfort, under these circumstances it is not job-related and consistent with business necessity to discipline Darren for disruptive behavior. It also would violate the ADA to transfer Darren to the night shift based on this conduct. While it is possible that the symptoms or manifestations of an employee's disability could, in some instances, disrupt the ability of others to do their jobs that is not the case here. Employees have not complained that Darren's voice is too loud, that the content of what he says is inappropriate, or that he is preventing them from doing their jobs. They simply do not like being around someone who talks to himself.

*Questions 10 - 15 assume that the conduct rule at issue is job-related and consistent with business*

*necessity.*

## 10. What should an employer do if an employee mentions a disability and/or the need for an accommodation for the first time in response to counseling or discipline for unacceptable conduct?

If an employee states that her disability is the cause of the conduct problem or requests accommodation, the employer may still discipline the employee for the misconduct. If the appropriate disciplinary action is termination, the ADA would not require further discussion about the employee's disability or request for reasonable accommodation.[49]

If the discipline is something less than termination, the employer may ask about the disability's relevance to the misconduct, or if the employee thinks there is an accommodation that could help her avoid future misconduct.[50] If an accommodation is requested, the employer should begin an "interactive process" to determine whether one is needed to correct a conduct problem, and, if so, what accommodation would be effective.[51] The employer may seek appropriate medical documentation to learn if the condition meets the ADA's definition of "disability," whether and to what extent the disability is affecting the employee's conduct, and what accommodations may address the problem.

Employers cannot refuse to discuss the request or fail to provide reasonable accommodation as a punishment for the conduct problem. If a reasonable accommodation is needed to assist an employee with a disability in controlling his behavior and thereby preventing another conduct violation, and the employer refuses to provide one that would not cause undue hardship, then the employer has violated the ADA.

> Example 19: Tom, a program director, has successfully controlled most symptoms of his bipolar disorder for a long period, but lately he has had a recurrence of certain symptoms. In the past couple of weeks, he has sometimes talked uncontrollably and his judgment has seemed erratic, leading him to propose projects and deadlines that are unrealistic. At a staff meeting, he becomes angry and disparaging towards a colleague who disagrees with him. Tom's supervisor tells him after the meeting that his behavior was inappropriate. Tom agrees and reveals for the first time that he has bipolar disorder. He explains that he believes he is experiencing a recurrence of symptoms and says that he will contact his doctor immediately to discuss medical options. The next day Tom provides documentation from his doctor explaining the need to put him on different medication, and stating that it should take no more than six to eight weeks for the medication to eliminate the symptoms. The doctor believes that Tom can still continue working, but that it would be helpful for the next couple of months if Tom had more discussions with his supervisor about projects and deadlines so that he could receive feedback to ensure that his goals are realistic. Tom also requests that his supervisor provide clear instructions in writing about work assignments as well as intermediate timetables to help him keep on track. The supervisor responds that Tom must treat his colleagues with respect and agrees to provide for up to two months all of the reasonable accommodations Tom has requested because they would assist him to continue performing his job without causing an undue hardship.

> - *Practical Guidance: Ideally, employees will request reasonable accommodation before conduct problems arise, or at least before they become too serious.[52] Although the ADA does not require employees to ask for an accommodation at a specific time, the timing of a request for reasonable accommodation is important because an employer does not have to rescind discipline (including termination) warranted by misconduct. Employees should not assume that an employer knows that an accommodation is needed to address a conduct issue merely because the employer knows about the employee's disability. Nor does an employer's knowledge of an employee's disability require the employer to ask if the misbehavior is disability-related.*

Example 20: An employee informs her supervisor that she has been diagnosed with bipolar disorder. A few months later, the supervisor asks to meet with the employee concerning her work on a recent assignment. At the meeting, the supervisor explains that the employee's work has been generally good, but he provides some constructive criticism. The employee becomes

angry, yells at the supervisor, and curses him when the supervisor tells her she cannot leave the meeting until he has concluded discussing her work. The employer terminates the employee, the same punishment given to any employee who is insubordinate. The employee protests her termination, telling the supervisor that her outburst was a result of her bipolar disorder which makes it hard for her to control her temper when she is feeling extreme stress. She says she was trying to get away from the supervisor when she felt she was losing control, but he ordered her not to leave the room. The employee apologizes and requests that the termination be rescinded and that in the future she be allowed to leave the premises if she feels that the stress may cause her to engage in inappropriate behavior. The employer may leave the termination in place without violating the ADA because the employee's request for reasonable accommodation came after her insubordinate conduct.

## 11. May an employer only discipline an employee whose misconduct results from a disability for conduct prohibited in an employee handbook or similar document?

No. An employer may enforce conduct rules that are not found in workplace policies, employee handbooks, or similar documents so long as they are: (1) job-related and consistent with business necessity, and (2) applied consistently to all employees and not just to a person with a disability. Many times, the proscribed conduct is well understood by both the employer and employees as being unacceptable without being formally written, such as a prohibition on insubordination.

> Example 21: Mary's disability has caused her to yell at and insult her supervisor and coworkers. There is no formal policy addressing such conduct, nor need there be. Prohibiting an employee from acting belligerently towards a supervisor or coworkers is job-related and consistent with business necessity, and thus Mary's supervisor may discipline her as long as the same discipline would be imposed on a non-disabled employee for the same conduct.

Sometimes, an employee's conduct may not be directly addressed by a conduct rule but nonetheless clearly violates a behavior norm that is job-related and consistent with business necessity.

> Example 22: Jane has Down syndrome and is employed as a bagger at a grocery store. Jane is very friendly and likes to hug customers as they leave. Although she means well, management finds this behavior is unacceptable. Jane's manager talks to her and also contacts the job coach who helped Jane learn to do her job. The manager explains the unacceptable behavior and as a reasonable accommodation has the job coach return to work with Jane for a few days until she learns that she cannot hug the customers.

> It is job-related and consistent with business necessity to require that Jane refrain from hugging customers. Although the grocery store does not have a rule specifically prohibiting physical contact with customers, refraining from such conduct is an inherent part of treating customers with appropriate respect and courtesy.[53]

> Example 23: Jenny has cerebral palsy which causes her hands to shake. The supervisor observes Jenny spilling some of her drink on the counter in the office kitchen, and notices that she fails to clean it up. The supervisor has observed non-disabled employees leaving a mess, but has never disciplined them for this behavior. Nevertheless, the supervisor tells Jenny she can no longer use the kitchen because of her failure to clean up the spill. Although Jenny's disability did not prevent her from cleaning up, singling Jenny out for punishment could be a violation of the ADA.

On the other hand, the supervisor could have prohibited Jenny from using the kitchen if he had previously announced that employees would be required to clean up after themselves or risk being denied access to the kitchen.

- *Practical Guidance: Whether rules are written or not, employers should be careful that all conduct rules are applied consistently and should not single out an employee with a disability for harsher treatment. In addition, because ad hoc rules are just that, ad hoc, an employer may have more difficulty demonstrating that they are job-related and consistent with business necessity.*

**12. May an employer require an employee to receive or change treatment for a disability to comply with a conduct standard?**

No. Decisions about medication and treatment often involve many considerations beyond the employer's expertise.[54]

- *Practical Guidance: Regardless of whether employers believe they are trying to help employees who have medical conditions, employers should focus instead on addressing unacceptable workplace conduct. Employer comments about the disability and its treatment could lead to potential ADA claims (e.g., the employer "regarded" the employee as having a disability or the employer engaged in disparate treatment).*

Although employers should not intervene in medical decisions, they should be prepared to discuss providing a reasonable accommodation that will enable an employee to correct a conduct problem. The ADA requires an employer to provide reasonable accommodation regardless of what effect medication or other medical treatment may have on an employee's ability to perform the job. However, if an employee does not take medication or receive treatment and, as a result, cannot perform the essential functions of the position or poses a direct threat, even with a reasonable accommodation, she is unqualified.[55] Similarly, if an employee does not take medication or receive treatment and, as a result, cannot meet a conduct standard, even with a reasonable accommodation, the employer may take disciplinary action.

<u>Example 24</u>: An employee with a psychiatric disability takes medication, but one side effect is that the employee sometimes becomes restless. The employee's restlessness leads him to become easily distracted by nearby colleagues which, in turn, causes him to interrupt his coworkers. The supervisor counsels the employee about his disruptiveness and lack of focus. The employee tells the supervisor about his disability and the side effect of the medication he takes, and asks to be moved to a quieter work space to lessen the distractions. He also says that it would be helpful if his supervisor gave him more structured assignments with more deadlines to focus his attention.

The supervisor consults with the HR director, telling her that he thinks there is a special medication that could control the restlessness. The HR director appropriately rejects the supervisor's suggestion and recommends that the supervisor begin providing more structured assignments while she requests medical documentation from the employee confirming the side effect. Once confirmed, the HR director finds a vacant cubicle in a quiet part of the office which, together with the more structured assignments, resolves the issue.

C. Questions pertaining to both performance and conduct issues

**13. Should an employer mention an employee's disability during a discussion about a performance or conduct problem if the employee does not do so?**

Generally, it is inappropriate for the employer to focus discussion about a performance or conduct problem on an employee's disability. The point of the employer's comments should be a clear explanation of the employee's performance deficiencies or misconduct and what he expects the employee to do to improve. Moreover, emphasizing the disability risks distracting from the focus on performance or conduct, and in some cases could result in a claim under the ADA that the employer "regarded" (or treated) the individual as having a disability.

- *Practical Guidance: It is generally preferable that the employee initiate any discussion on the role of the disability. Ideally, employers should discuss problems before they become too serious in order to give the employee an opportunity as soon as possible to address the employer's concerns.*
- *Practical Guidance: An employee who is on notice about a performance or conduct problem and who believes the disability is contributing to the problem should evaluate whether a reasonable accommodation would be helpful. An employee should not assume that an employer knows about a disability based on certain behaviors or*

Case 1:16-cv-03422-CCB   Document 21-2   Filed 03/22/17   Page 13 of 32

## 14. When discussing performance or conduct problems with an employee who has a known disability, may an employer ask if the employee needs a reasonable accommodation?

Yes. An employer may ask an employee with a known disability who is having performance or conduct problems if he needs a reasonable accommodation.[58] Alternatively, an employer may prefer to ask if some step(s) can be taken to enable the employee to improve his performance or conduct without mentioning accommodation or the employee's disability.

- *Practical Guidance: In order to have a productive discussion about whether reasonable accommodation might be needed, it may be helpful if the employer first is clear with the employee about the performance or conduct issue and what the employee needs to do to improve.*

Example 25: A supervisor knows that an employee has failing eyesight due to macular degeneration. The employee does not want to acknowledge his vision problem, even though the supervisor points out mounting errors that seem connected to the deteriorating vision. The supervisor enjoys working with the employee and knows he is capable of good work, but is uncertain how to handle this situation.

The supervisor may ask the employee if there is anything she can do to assist him. Because the supervisor knows about the deteriorating eyesight, she may (but is not required to) ask if the employee needs a reasonable accommodation, such as magnifying equipment, software that reads material from a computer screen, or large print. However, the supervisor cannot force the employee to accept an accommodation. If the employee refuses to discuss a reasonable accommodation, the supervisor may continue to address the performance problem in the same manner that she would with any other employee.

## 15. Does an employer have to provide a reasonable accommodation to an employee with a disability who needs one to discuss a performance or conduct problem?

Yes. An employer might have to provide a reasonable accommodation to enable an employee with a disability to understand the exact nature of any performance or conduct problem and to have a meaningful discussion with the employer about it.[59]

Example 26: A supervisor knows that a deaf employee who has previously requested reasonable accommodation cannot lip read. Nonetheless, the supervisor approaches the employee and begins verbally discussing mistakes she has been making. The supervisor has violated the ADA by not providing an effective reasonable accommodation to have a meaningful discussion with the employee.[60] Possible accommodations include a written exchange (e.g., e-mails) if the mistakes are simple ones to address and the discussion is likely to be short and straightforward, or a sign language interpreter if the discussion is likely to be lengthy and complex.

Similarly, an employer may need to provide reasonable accommodation to enable an employee with a disability to participate in a performance review. Even if there are no performance problems, the employee is entitled to the same opportunity as a non-disabled employee to discuss his performance.

Example 27: A blind employee asks for her performance review in Braille. Her supervisor would prefer to read the review aloud instead. All other employees get a written copy of their review. The supervisor's suggestion is not an effective accommodation because it would not permit the blind employee to read the performance review when she wants like other employees. The employer must provide a reasonable accommodation (absent undue hardship) that allows the employee to read the review, and this may include a Braille copy or a version in another format that the employee is capable of reading on her own (e.g., an electronic version).

An employer also may need to provide a reasonable accommodation to enable an employee with a disability to participate in an investigation into misconduct, whether as the subject of the investigation or a witness, to ensure the employee understands what is happening and can provide meaningful input.

> **Example 28:** A deaf employee at a federal agency is involved in an altercation with a coworker. Because of the uncertainty about each employee's role in the altercation, agency officials initiate an investigation but deny the employee's request for a sign language interpreter when they come to interview him and instead rely on an exchange of notes. Although there were some answers the employee gave that the officials would have followed up on if the communication was oral, they did not do so because of the difficulty of exchanging handwritten notes. Thus, the accommodation is not effective because it hampers the ability of the parties to communicate fully with each other. Effective communication is especially critical given the seriousness of the situation and the potentially high stakes (disciplinary action may be imposed on this employee or the coworker). The agency should have postponed the interview until it could get an interpreter.[61]

### D. Seeking medical information when there are performance or conduct problems

Some employers want to ask for medical information in response to an employee's performance or conduct problem because they believe it might help them to understand why the problem exists and what might be an appropriate response.

### 16. May an employer require an employee who is having performance or conduct problems to provide medical information or undergo a medical examination?

Sometimes. The ADA permits an employer to request medical information or order a medical examination when it is job-related and consistent with business necessity.[62] Generally, this means that the employer has a reasonable belief, based on objective evidence, that an employee is unable to perform an essential function or will pose a "direct threat" because of a medical condition.[63] The scope and manner of any inquiries or medical examinations must be limited to information necessary to determine whether the employee is able to perform the essential functions of the job or can work without posing a direct threat.[64]

An employer must have objective evidence suggesting that a medical reason is a likely cause of the problem to justify seeking medical information or ordering a medical examination. In limited circumstances, the nature of an employee's performance problems or unacceptable conduct may provide objective evidence that leads an employer to a reasonable belief that a medical condition may be the cause.[65]

> **Example 29:** An employee with no history of performance or conduct problems suddenly develops both. Over the course of several weeks, her work becomes sloppy and she repeatedly misses deadlines. She becomes withdrawn and surly, and in meetings she is distracted and becomes belligerent when asked a question. When her supervisor starts asking her about her behavior, she responds with answers that make no sense.
>
> The sudden, marked change in performance and conduct, the nonsensical answers, and the belligerent behavior all reasonably suggest that a medical condition may be the cause of the employee's performance and conduct problems. This employer may ask the employee medical questions (e.g., are you ill, have you seen a doctor, is there a medical reason for the sudden, serious change in your behavior). The employer also may, as appropriate, require the employee
>
> (1) to go to an Employee Assistance Program (EAP);
>
> (2) to produce medical documentation that she is fit to continue working (including the ability to meet minimum performance requirements and exhibit appropriate behavior); and/or
>
> (3) to undergo an appropriate medical examination related to the performance and conduct issues.

The employer also may take a number of actions while it awaits medical documentation on whether she is able to continue performing her job, including placing the employee on leave.

Not all performance problems or misconduct will justify an employer's request for medical information or a medical examination. An employer cannot require a medical examination solely because an employee's behavior is annoying, inefficient, or otherwise unacceptable. [66] In fact, there may be other reasons that an employee experiences performance or conduct problems that are unrelated to any medical condition, such as insufficient knowledge, conflict with a supervisor or coworker, lack of motivation or skills, a poor attitude, or personal problems (such as a divorce or other family problems).

> Example 30: A supervisor finds an employee asleep at his desk. She wants to send the employee for a medical examination. However, there could be many reasons the employee is asleep. The employee may work a second job, stay up late at night, or have family problems that are causing him to lose sleep. Because there is insufficient evidence to focus on a medical cause for this behavior, requiring the employee to produce medical documentation or to undergo a medical examination would not be justified. However, if the employee when asked to explain his behavior reveals that the cause is a medical problem (e.g., sleep apnea), then the employer would have sufficient objective evidence to justify requesting additional medical information or a medical examination.

> Example 31: An employee with Parkinson's disease has constant run-ins with his supervisor, including ignoring instructions, taking extra breaks, and using disrespectful language. Although the employer may discipline the employee for these acts of insubordination, no evidence suggests that this behavior stems from his Parkinson's disease. Therefore, the employer may not ask the employee for medical information or order him to have a medical examination.

## 17. Must an employer who has a sufficient basis for requesting medical information or requiring a medical examination take such steps instead of imposing discipline for poor performance or conduct?

No. The ADA permits but does not require an employer to seek medical information. An employer may choose to focus solely on the performance or conduct problems and take appropriate steps to address them.[67]

> - *Practical Guidance: Even when the ADA permits an employer to seek medical information or require a medical examination, it still may be difficult to determine if that is an appropriate course of action. It is advisable for employers to determine whether simply addressing the problem without such information will be effective.*

## E. Attendance issues

Employers generally have attendance requirements. Many employers recognize that employees need time off and therefore provide paid leave in the form of vacation or annual leave, personal days, and sick days. Some employers also offer opportunities to use advance or unpaid leave, as well as leave donated by coworkers. Certain laws may require employers to extend leave, such as the ADA (as a reasonable accommodation) and the Family and Medical Leave Act.[68]

## 18. Must employees with disabilities be granted the same access to an employer's existing leave program as all other employees?

Yes. Employees with disabilities are entitled to whatever forms of leave the employer generally provides to its employees. This means that when an employee with a disability seeks leave under an employer's regular leave policies, she must meet any eligibility requirements for the leave that are imposed on all employees (e.g., only employees who have completed a probation program can be granted advance leave). Similarly, employers must provide employees with disabilities with equal access to programs granting flexible work schedules and modified schedules.[69]

> Example 32: An employee requests a nine-month leave of absence because of a disability. The

employer has a policy of granting unpaid medical leave for one year but it refuses this
employee's request and terminates him instead. If the employer's policy is to grant employees up
to one year of medical leave, with no other conditions, denying this benefit because an employee
has a disability would violate the ADA.[70]

Case 1:16-cv-03422-CCB Document 112 Filed 06/02/17 Page 16 of 32

If an employee with a disability needs leave or a modified schedule beyond that provided for under an
employer's benefits program, the employer may have to grant the request as a reasonable accommodation
if there is no undue hardship.

## 19. Does the ADA require employers to modify attendance policies as a reasonable accommodation, absent undue hardship?

Yes. If requested, employers may have to modify attendance policies as a reasonable accommodation,
absent undue hardship.[71] Modifications may include allowing an employee to use accrued paid leave or
unpaid leave, adjusting arrival or departure times (e.g., allowing an employee to work from 10 a.m. to 6
p.m. rather than the usual 9 a.m. to 5 p.m. schedule required of all other employees), and providing
periodic breaks.[72]

## 20. Does the ADA require that employers exempt an employee with a disability from time and attendance requirements?

Although the ADA may require an employer to modify its time and attendance requirements as a
reasonable accommodation (absent undue hardship), employers need not completely exempt an employee
from time and attendance requirements, grant open-ended schedules (e.g., the ability to arrive or leave
whenever the employee's disability necessitates), or accept irregular, unreliable attendance. Employers
generally do not have to accommodate repeated instances of tardiness or absenteeism that occur with
some frequency, over an extended period of time and often without advance notice.[73] The chronic,
frequent, and unpredictable nature of such absences may put a strain on the employer's operations for a
variety of reasons, such as the following:

- an inability to ensure a sufficient number of employees to accomplish the work required;

- a failure to meet work goals or to serve customers/clients adequately;

- a need to shift work to other employees, thus preventing them from doing their own work or
imposing significant additional burdens on them;[74]

- incurring significant additional costs when other employees work overtime or when temporary
workers must be hired.

Under these or similar circumstances, an employee who is chronically, frequently, and unpredictably
absent may not be able to perform one or more essential functions of the job, or the employer may be
able to demonstrate that any accommodation would impose an undue hardship, thus rendering the
employee unqualified.[75]

> **Example 33:** An employee with asthma who is ineligible for FMLA leave works on an assembly
> line shift that begins at 7 a.m. Recently, his illness has worsened and his doctor has been unable
> to control the employee's increasing breathing difficulties. As a result of these difficulties, the
> employee has taken 12 days of leave during the past two months, usually in one- or two-day
> increments. The severe symptoms generally occur at night, thus requiring the employee to call in
> sick early the next morning. The lack of notice puts a strain on the employer because the
> assembly line cannot function well without all line employees present and there is no time to
> plan for a replacement. The employer seeks medical documentation from the employee's doctor
> about his absences and the doctor's assessment of whether the employee will continue to have a
> frequent need for intermittent leave. The doctor responds that various treatments have not
> controlled the asthmatic symptoms, there is no way to predict when the more serious symptoms
> will suddenly flare up, and he does not expect any change in this situation for the foreseeable
> future. Given the employee's job and the consequences of being unable to plan for his absences,
> the employer determines that he cannot keep the employee on this shift. Assuming no position is

available for reassignment, the employer does not have to retain the employee.

- *Practical Guidance: It is best if an employee requests accommodation once he is aware that he will be violating an attendance policy or requiring intermittent leave due to a disability. Otherwise, an employer is entitled to continue holding the employee accountable for such absences without any obligation to consider if there is a reasonable accommodation that might address the problem. Moreover, prompt requests for accommodation may enable an employer to better plan for schedule modifications or absences, thus permitting an employee to get the accommodation.*

Example 34: An office worker with epilepsy who is ineligible for FMLA leave has two seizures at work in a three-month period. In both instances, the after-effects of the seizure required the individual to leave work for the remainder of the day, although she was able to return to work on the following day. To determine whether the seizures will continue and their impact on attendance and job performance, the employer requests documentation from the employee's doctor. The doctor responds that the employee may experience similar seizures once every two to four months, that there is no way to predict exactly when a seizure will occur, and that the employee will need to take the rest of the day off when one does occur. The doctor sees no reason why the employee would need more than a day's leave for each seizure. Although the employee's need for leave is unpredictable, the employee will require only one day of leave every few months (or approximately six time a year). The employer determines that it is appropriate to grant the employee the reasonable accommodation of intermittent leave, as needed, because there will be no undue hardship and this accommodation will permit the employee to recover from a seizure.

Example 35: An employee works as an event coordinator. She has exhausted her FMLA leave due to a disability and now requests additional intermittent leave as a reasonable accommodation. The employee can never predict when the leave will be needed or exactly how much leave she will need on each occasion, but she always needs from one to three days of leave at a time. The employer initially agrees to her request and the employee takes 14 days of leave over the next two months. Documentation from the employee's doctor shows that the employee will continue to need similar amounts of intermittent leave for at least the next six months. Event planning requires staff to meet strict deadlines and the employee's sudden absences create significant problems. Given the employee's prognosis of requiring unpredictable intermittent leave, the employer cannot plan work around these absences. The employer has already had to move coworkers around to cover the employee's absences and delay certain work. The on-going, frequent, and unpredictable nature of the absences makes additional leave an undue hardship, and thus the employer is not required to provide it as a reasonable accommodation. If the employer cannot reassign the employee to a vacant position that can accommodate her need for intermittent leave, it is not required to retain her.

Example 36: An employee with multiple sclerosis works as a bookkeeper for a small medical practice that is not covered under the FMLA but is covered under the ADA. He requests intermittent leave as a reasonable accommodation. The employee has already taken five days of sick leave for the disability when he makes the request (a two-day and a three-day leave of absence). Documentation from the employee's doctor shows that the employee will continue to need intermittent leave for at least several months. The doctor cannot predict when or how much leave will be needed, but based on the employee's treatment and the current situation, the doctor believes that each leave of absence would be from one to three days. The employer determines that no undue hardship exists at this time and grants the employee intermittent leave for the disability consistent with the doctor's letter. The employer explains that it will reassess the accommodation in six months or sooner if the employee's use of leave begins to have a negative impact on its operations. During the next six months, the employee takes 12 days of medical leave. While the employee's unpredictable absences cause some problems, the employer has managed to adjust to the situation without burdening other employees or falling behind in the workload, the employee has made up work where he could, and the employee has always notified his supervisor immediately when he realizes he needs to take leave. Because there is no undue hardship at this time, the employer agrees to continue the reasonable

accommodation of intermittent leave under the same conditions as before.

## 21. Do employers have to grant indefinite leave as a reasonable accommodation to employees with disabilities?

No. Although employers may have to grant extended medical leave as a reasonable accommodation, they have no obligation to provide leave of indefinite duration. Granting indefinite leave, like frequent and unpredictable requests for leave, can impose an undue hardship on an employer's operations.[76] Indefinite leave is different from leave requests that give an approximate date of return (e.g., a doctor's note says that the employee is expected to return around the beginning of March) or give a time period for return (e.g., a doctor's note says that the employee will return some time between March 1 and April 1). If the approximate date of return or the estimated time period turns out to be incorrect, the employer may seek medical documentation to determine whether it can continue providing leave without undue hardship or whether the request for leave has become one for leave of indefinite duration.

> Example 37: An employer's policy allows employees one year of medical leave but then requires either that they return (with or without reasonable accommodation, if appropriate) or be terminated. An employee with a disability who has been on medical leave for almost one year informs her employer that she will need a total of 13 months of leave for treatment of her disability and then she will be able to return to work. She provides detailed medical documentation in support of her request. This request is not for indefinite leave because the employee provides a specific date on which she can return; the employer must provide the additional month of leave as a reasonable accommodation unless it would cause an undue hardship. The employer may consider the impact on its operations caused by the initial 12-month absence, along with other undue hardship factors. [77] The mere fact that granting the requested accommodation requires the employer to modify its leave policy for this employee does not constitute undue hardship.[78]

> Example 38: The employer has the same leave policy described in Example 37. An employee with a disability has been on medical leave for one year when he informs his employer that he will never be able to return to his old job due to his disability, and he is unable to provide information on whether and when he could return to another job that he could perform. The employer may terminate this worker because the ADA does not require the employer to provide indefinite leave.[79]

> Example 39: An employer grants 12 weeks of medical leave at the request of an employee with a disability. At the end of this period, the employee submits a note from his doctor requesting six additional weeks, which the employer grants. At the conclusion of this period, the employee submits a new note seeking another six weeks of leave, which would bring the employee's total leave to 24 weeks. The employer is concerned about the requests for extensions and whether they signal a pattern. Although the employer has been able to cope with the extended absence to date, it foresees a more serious impact on its operations if the employee requires more than a few additional weeks of leave. The employer requests information from the employee's doctor about the two extensions, including the reason why the doctor's earlier predictions on return turned out to be wrong, a clear description of the employee's current condition, and the basis for the doctor's conclusion that only another six weeks of leave are required. The doctor explains that there have been complications and that the employee is not responding to treatment as expected. The doctor states that the current request for an additional six weeks may not be sufficient and that more leave, maybe up to several months, may be needed. The doctor states that the employee's current condition does not permit a clear answer as to when he will be able to return to work. This information supports a conclusion that the employee's request has become one for indefinite leave. This poses an undue hardship and therefore the employer may deny the request.

## 22. Does an employer have to grant a reasonable accommodation to an employee with a disability who waited until after attendance problems developed to request it?

An employer may impose disciplinary action, consistent with its policies as applied to other employees, for attendance problems that occurred prior to a request for reasonable accommodation. However, if the employee's infraction does not merit termination but some lesser disciplinary action (e.g., a warning), and the employee then requests reasonable accommodation, the employer must consider the request and determine if it can provide a reasonable accommodation without causing undue hardship.

> Example 40: An employee with diabetes is given a written warning for excessive absenteeism. After receiving the warning, the employee notifies his employer that his absences were related to his diabetes which is not well controlled. The employee asks that the employer withdraw the written warning and provide him with leave when needed due to complications from his diabetes. The employee's doctor has changed his treatment and states that he expects the employee's diabetes to be well controlled within the next one to two months. The doctor also states that there might still be a need for leave during this transitional period, but expects the employee would be out of work no more than three or four days.
>
> The employer does not have to withdraw the written warning, but it must grant the requested accommodation unless it would pose an undue hardship.
>
> Example 41: A bank manager's starting time is 8 a.m., but due to the serious side effects of medication she takes for her disability she cannot get to work until 9 a.m. The manager's late arrival results in a verbal warning, prompting her to request that she be allowed to arrive at 9 a.m. because of the side effects of medication she takes for her disability. The manager's modified arrival time would not affect customer service or the ability of other employees to do their jobs, and she has no duties that require her to be at the bank before 9 a.m. The bank denies this request for reasonable accommodation, saying that as a manager she must set a good example for other employees about the importance of punctuality. Because the manager's later arrival time would not affect the manager's performance or the operation of the bank, denial of this request for reasonable accommodation is a violation of the ADA.[80]

## F. Dress codes

Employers may require employees to wear certain articles of clothing to protect themselves, coworkers, or the public (e.g., construction workers are required to wear certain head gear to prevent injury; health care workers wear gloves to prevent transmission of disease from or to patients). Sometimes employers impose dress codes to make employees easily identifiable to customers and clients, or to promote a certain image (e.g., a movie theater requires its staff to wear a uniform; a store requires all sales associates to dress in black). A dress code also may prohibit employees from wearing certain items either as a form of protection or to promote a certain image (e.g., prohibitions on wearing jewelry or baseball caps, or requirements that workers wear business attire).[81]

## 23. May an employer require that an employee with a disability follow the dress code imposed on all workers in the same job?

An employer may require an employee with a disability to observe a dress code imposed on other employees in the same job. For example, a professional office may require its employees to wear appropriate business attire because the nature of the jobs could bring them into contact with clients, customers, and the public.

Where an employee's disability makes it difficult for him to comply fully with a dress code, an employer may be able to provide a reasonable accommodation.

> Example 42: An employer requires all of its employees to wear a uniform provided by the employer. An employee with quadriplegia cannot wear this uniform because he cannot use zippers and buttons and because the shape of the uniform causes discomfort when he sits in a wheelchair. The employee tells the employer about these difficulties and informs the employer about manufacturers that specialize in making clothes for persons with disabilities. The individual shows the employer a catalogue and together they are able to choose items that approximate the uniform, thus meeting the needs of both the employer and the individual. As a reasonable

accommodation, the employer provides the employee with the specified uniform.

Example 43: An employee is undergoing radiation therapy for cancer which has caused sores to develop. The employee cannot wear her usual uniform because it is causing severe irritation as it constantly rubs against the sores. The employee seeks an exemption from the uniform requirement until the radiation treatment ends and the sores have disappeared or are less irritating. The employer agrees, and working with the employee, decides on acceptable clothes that the employee can wear as a reasonable accommodation that meet the medical needs of the employee, easily identify the individual as an employee, and enable the individual to present a professional appearance.

Example 44: A professional office requires that its employees wear business dress at all times. Due to diabetes, Carlos has developed foot ulcers making it very painful to wear dress shoes. Also, dress shoes make the ulcers worse. Carlos asks to wear sneakers instead. The supervisor is concerned about Carlos's appearance when meeting with clients. These meetings usually occur once a week and last about an hour or two. Carlos and his doctor agree that Carlos can probably manage to wear dress shoes for this limited time. Carlos also tells his supervisor that he will purchase black leather sneakers to wear at all other times. The supervisor permits Carlos to wear black sneakers except when he meets with clients.

If the employee cannot meet the dress code because of a disability, the employer may still require compliance if the dress code is job-related and consistent with business necessity. An employer also may require that an employee with a disability meet dress standards required by federal law. If an individual with a disability cannot comply with a dress code that meets the "business necessity" standard or is mandated by federal law, even with a reasonable accommodation, he will not be considered "qualified."

Example 45: An employer, pursuant to an OSHA regulation, requires employees to wear steel-toed boots. An employee has severe burns on his feet and legs that prevent him from wearing these types of boots, no accommodation is possible, and so he asks for an exemption. The ADA does not prevent employers from complying with other federal laws, including the Occupational Safety and Health Act which requires employees working in certain jobs, industries, or positions to wear particular items of clothing or protective gear. Under these circumstances, the employer may insist that the employee wear steel-toed boots, and because the employee cannot comply with this rule he is not "qualified."

G. Alcoholism and illegal use of drugs

## 24. Does the ADA protect employees with substance abuse problems?

The ADA may protect a "qualified" alcoholic who can meet the definition of "disability." The ADA does not protect an individual who currently engages in the illegal use of drugs,[82] but may protect a recovered drug addict who is no longer engaging in the illegal use of drugs, who can meet the other requirements of the definition of "disability,"[83] and who is "qualified." As explained in the following questions, the ADA has specific provisions stating that individuals who are alcoholics or who are currently engaging in the illegal use of drugs may be held to the same performance and conduct standards as all other employees.

## 25. May an employer require an employee who is an alcoholic or who illegally uses drugs to meet the same standards of performance and conduct applied to other employees?

Yes. The ADA specifically provides that employers may require an employee who is an alcoholic or who engages in the illegal use of drugs to meet the same standards of performance and behavior as other employees.[84] This means that poor job performance or unsatisfactory behavior – such as absenteeism, tardiness, insubordination, or on-the-job accidents – related to an employee's alcoholism or illegal use of drugs need not be tolerated if similar performance or conduct would not be acceptable for other employees.

Example 46: A federal police officer is involved in an accident on agency property for which he is charged with driving under the influence of alcohol (DUI). Approximately one month later, the

employee receives a termination notice stating that his conduct makes it inappropriate for him to continue in his job. The employee states that this incident made him realize he is an alcoholic and that he is obtaining treatment, and he seeks to remain in his job. The employer may proceed with the termination.[85]

Example 47: An employer has a lax attitude about employees arriving at work on time. One day a supervisor sees an employee he knows to be a recovered alcoholic come in late. Although the employee's tardiness is no worse than other workers and there is no evidence to suggest the tardiness is related to drinking, the supervisor believes such conduct may signal that the employee is drinking again. Thus, the employer reprimands the employee for being tardy. The supervisor's actions violate the ADA because the employer is holding an employee with a disability to a higher standard than similarly situated workers.

## 26. May an employer discipline an employee who violates a workplace policy that prohibits the use of alcohol or the illegal use of drugs in the workplace?

Yes. The ADA specifically permits employers to prohibit the use of alcohol or the illegal use of drugs in the workplace.[86] Consequently, an employee who violates such policies, even if the conduct stems from alcoholism or drug addiction, may face the same discipline as any other employee. The ADA also permits employers to require that employees not be under the influence of alcohol or the illegal use of drugs in the workplace.

Employers may comply with other federal laws and regulations concerning the use of drugs and alcohol, including: (1) the Drug-Free Workplace Act of 1988; (2) regulations applicable to particular types of employment, such as law enforcement positions; (3) regulations of the Department of Transportation for airline employees, interstate motor carrier drivers and railroad engineers; and (4) the regulations for safety sensitive positions established by the Department of Defense and the Nuclear Regulatory Commission.[87]

## 27. May an employer suggest that an employee who has engaged in misconduct due to alcoholism or the illegal use of drugs go to its Employee Assistance Program (EAP) in lieu of discipline?

Yes. The employer may discipline the employee, suggest that the employee seek help from the EAP, or do both. An employer will always be entitled to discipline an employee for poor performance or misconduct that result from alcoholism or drug addiction. But, an employer may choose instead to refer an employee to an EAP or to make such a referral in addition to imposing discipline. However, the ADA does not require employers to establish employee assistance programs or to provide employees with an opportunity for rehabilitation in lieu of discipline.

## 28. What should an employer do if an employee mentions drug addiction or alcoholism, or requests accommodation, for the first time in response to discipline for unacceptable performance or conduct?

The employer may impose the same discipline that it would for any other employee who fails to meet its performance standard or who violates a uniformly-applied conduct rule. If the appropriate disciplinary action is termination, the ADA would not require further discussion about the employee's disability or request for accommodation.

An employee whose poor performance or conduct is attributable to the **current illegal use of drugs** is not covered under the ADA.[88] Therefore, the employer has no legal obligation to provide a reasonable accommodation and may take whatever disciplinary actions it deems appropriate, although nothing in the ADA would limit an employer's ability to offer leave or other assistance that may enable the employee to receive treatment.

By contrast, an employee whose poor performance or conduct is attributable to **alcoholism** may be entitled to a reasonable accommodation, separate from any disciplinary action the employer chooses to impose and assuming the discipline for the infraction is not termination. If the employee only mentions the

alcoholism but makes no request for accommodation, the employer may ask if the employee believes an accommodation would prevent further problems with performance or conduct. If the employee requests an accommodation, the employer should begin an "interactive process" to determine if an accommodation is needed to correct the problem. This discussion may include questions about the connection between the alcoholism and the performance or conduct problem. The employer should seek input from the employee on what accommodations may be needed and also may offer its own suggestions. Possible reasonable accommodations may include a modified work schedule to permit the employee to attend an on-going self-help program.

> Example 48: An employer has warned an employee several times about her tardiness. The next time the employee is tardy, the employer issues her a written warning stating one more late arrival will result in termination. The employee tells the employer that she is an alcoholic, her late arrivals are due to drinking on the previous night, and she recognizes that she needs treatment. The employer does not have to rescind the written warning and does not have to grant an accommodation that supports the employee's drinking, such as a modified work schedule that allows her to arrive late in the morning due to the effects of drinking on the previous night. However, absent undue hardship, the employer must grant the employee's request to take leave for the next month to enter a rehabilitation program.

## 29. Must an employer provide a "firm choice" or "last chance agreement" to an employee who otherwise could be terminated for poor performance or misconduct resulting from alcoholism or drug addiction?

An employer may choose, but is not required by the ADA, to offer a "firm choice" or "last chance agreement" to an employee who otherwise could be terminated for poor performance or misconduct that results from alcoholism or drug addiction. Generally, under a "firm choice" or "last chance agreement" an employer agrees not to terminate the employee in exchange for an employee's agreement to receive substance abuse treatment, refrain from further use of alcohol or drugs, and avoid further workplace problems. A violation of such an agreement usually warrants termination because the employee failed to meet the conditions for continued employment.[89]

## H. Confidentiality issues arising from granting reasonable accommodation to avoid performance or conduct problems

## 30. May an employer tell a coworker that an employee is receiving a reasonable accommodation?

No. The ADA's confidentiality provisions do not permit employers to tell coworkers that an employee with a disability is receiving a reasonable accommodation.

> - *Practical Guidance: It is imperative that managers be trained about how to respond to such questions because it is reasonable to assume they may be asked questions by an employee's coworkers where the accommodation involves modification of a work schedule or dress code, or any other change in the workplace that a coworker may perceive as holding the employee with a disability to a different performance or conduct standard. Employers already keep many types of information confidential despite inquiries from their workers, such as personnel decisions like the reason an employee left a job or was transferred. This situation should be treated in similar fashion. An employer could respond that she does not discuss one employee's situation with another in order to protect the privacy of all employees, but she could assure the coworker that the employee is meeting the employer's work requirements.*

## I. Legal enforcement

Private Sector/State and Local Governments

An individual who believes that his employment rights have been violated on the basis of disability and wants to make a claim against an employer must file a "charge of discrimination" with the EEOC. The

charge must be filed by mail or in person with a local EEOC office within 180 days from the date of the alleged violation. The 180-day filing deadline is extended to 300 days if a state or local anti-discrimination law also covers the charge.[90]

The EEOC will notify the employer of the charge and will ask for a response and supporting information. Before a formal investigation, the EEOC may select the charge for its mediation program. Participation in mediation is free, voluntary, and confidential. Mediation may provide the parties with a quicker resolution of the case.

For a detailed description of the charge process, please refer to the EEOC website at http://www.eeoc.gov/employees/charge.cfm.

Federal Government

An individual who believes that his employment rights have been violated on the basis of disability and wants to make a claim against a federal agency must file a complaint with that agency. The first step is to contact an EEO Counselor at the agency within 45 days of the alleged discriminatory action. The individual may choose to participate in either counseling or in Alternative Dispute Resolution (ADR) if the agency offers this alternative. Ordinarily, counseling must be completed within 30 days and ADR within 90 days.

At the end of counseling, or if ADR is unsuccessful, the individual may file a complaint with the agency. The agency must conduct an investigation unless the complaint is dismissed. If a complaint contains one or more issues that must be appealed to the Merit Systems Protection Board (MSPB), the complaint is processed under the MSPB's procedures. For all other EEO complaints, once the agency finishes its investigation the complainant may request a hearing before an EEOC administrative judge or an immediate final decision from the agency.

For more information concerning enforcement procedures for federal applicants and employees, visit the EEOC website at http://www.eeoc.gov/facts/fs-fed.html.

---

**Footnotes**

[1] Michele J. Gelfand & Lisa H. Nishii, *Discrimination in Organizations: An Organizational-Level Systems Perspective*, in Discrimination at Work: The Psychological and Organizational Bases 89, 101 (Robert L. Dipboye & Adrienne Colella eds., 2004).

[2] All reasonable accommodation examples used in this document assume that the employee meets the ADA definition of "disability."

[3] 42 U.S.C. §§ 12101 – 12117 (2000); 29 C.F.R. §§ 1630.1 – 1630.16 (2007); 29 U.S.C. § 791(g) (2000);29 C.F.R. § 1614.203(b) (2007). Pursuant to Title II of the ADA, state and local government agencies with fewer than 15 employees must follow the same employment discrimination rules as found under Title I. 28 C.F.R. § 35.140(b)(2) (2007).

This publication will use the term "ADA" to refer to both the Americans with Disabilities Act and section 501 of the Rehabilitation Act. This fact sheet provides only a brief review of the ADA's statutory framework as it is relevant to performance and conduct standards. More information on the ADA and the Rehabilitation Act is available at EEOC's website, www.eeoc.gov.

[4] 42 U.S.C. § 12112(a) (2000); 29 C.F.R. § 1630.4 (2007).

[5] 42 U.S.C. § 12102(2) (2000); 29 C.F.R. § 1630.2(g) (2007). The ADA Amendments Act of 2008, signed into law on September 25, retains the three-part definition of disability but makes several significant changes to it with the intent that "disability" be construed broadly. Among the most significant changes are: (1) "substantially limits" no longer will be defined to mean either "significantly restricted" or "severely restricted," (2) major life activities now include "major bodily functions" such as normal cell growth, (3) the ameliorative effects of mitigating measures, other than ordinary eyeglasses or contact lenses, cannot

be considered in assessing whether an individual has a disability, (4) impairments that are episodic or in remission may be disabilities if they are substantially limiting when active, and (5) an individual will meet the "regarded as" prong of the definition if she can show that an employment decision (e.g., hiring, promotion, termination, discipline) was made because of an actual or perceived physical or mental impairment, regardless of whether the impairment limits or is perceived to limit a major life activity. The new definition of "regarded as" does not cover an impairment that is the basis of an employment decision if it is transitory (meaning that it will last six months or less) and minor.

6 42 U.S.C. § 12111(8) (2000); 29 C.F.R. § 1630.2(m) (2007).

7 See EEOC, A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act, at II (2.3) and IV (4.4), (1992), available at www.adainformation.org/Employment.aspx [hereinafter TAM].

8 Additional information on how to determine the essential and marginal functions of a position, and their significance in determining if an individual with a disability is "qualified," can be found in 29 C.F.R. pt. 1630 app. § 1630.2(m)-(n) (2007). See also TAM, supra note 7, at II (2.3(a)).

9 42 U.S.C. §§ 12112(b)(6), 12113(a) (2000); 29 C.F.R. §§ 1630.10 and 1630.15(b)(1) (2007).

10 See TAM, supra note 7, at IV (4.3).

11 42 U.S.C. § 12112(b)(5)(A) (2000); 29 C.F.R. § 1630.9(a) (2007); 29 C.F.R. pt. 1630 app. §§ 1630.9, 1630.10, 1630.15(b) and (c) (2007). The ADA Amendments Act of 2008 explicitly states that individuals who are covered only under the "regarded as" definition of "disability" would not be entitled to reasonable accommodation.

Reasonable accommodation may be required for several reasons, such as providing an applicant with a disability with an equal opportunity to compete for a job or to allow an employee with a disability equal access to a benefit or privilege of employment. This publication focuses on the reasonable accommodation obligation only as it applies to performance and conduct issues.

Examples of different types of reasonable accommodations can be found in, EEOC, Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, (rev. Oct. 17, 2002), available at http://www.eeoc.gov/policy/docs/accommodation.html [hereinafter Reasonable Accommodation]. In addition, the EEOC has published documents on various disabilities that address accommodations commonly used by individuals with these medical conditions, including persons with psychiatric disabilities, cancer, diabetes, blindness, deafness, intellectual disability (mental retardation), and epilepsy. The EEOC also has published documents on telework as a reasonable accommodation and accommodations commonly provided in certain types of jobs (e.g., attorney positions, the food service industry, and health care jobs). All of these documents can be found at EEOC's website, www.eeoc.gov.

12 See Reasonable Accommodation, supra note 11, at Question 1.

13 42 U.S.C. §§ 12111(10), 12112(b)(5)(A) (2000); 29 C.F.R. §§ 1630.2(p), 1630.9(a) (2007); 29 C.F.R. pt. 1630 app. § 1630.2(o) (2007) (employer is not required to reallocate essential functions); see also Reasonable Accommodation, supra note 11, in General Principles.

14 See 29 C.F.R. pt. 1630 app. § 1630.2(n) (2007) ("the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards"). See also TAM, supra note 7, at VII (7.7) ("An employer can hold employees with disabilities to the same standards of production/performance as other similarly situated employees without disabilities for performing essential job functions").

15 29 C.F.R. pt. 1630 app. § 1630.2(n) (2007); see also Reasonable Accommodation, supra note 11, in General Principles.

[16] See Yindee v. CCH Inc. 458 F.3d 599, 602 (7th Cir. 2006) (employee with disability terminated because of the reduction in the quantity and quality of her output as well as her failure to demonstrate the problem-solving skills required for her job); see also Leffel v. Valley Fin. Servs., 113 F.3d 787, 789, 795 (7th Cir.), cert. denied 522 U.S. 968 (1997) (employer lawfully terminated employee with multiple sclerosis for several performance problems, including failure to submit reports on a timely basis and failure to return phone calls). Cf. Libel v. Adventure Lands of Am., Inc., 482 F.3d 1028, 1034 (8th Cir. 2007) (affirming summary judgment for employer who terminated a sales and catering manager with multiple sclerosis because she often made mistakes, including failing to request menus in a timely fashion, selling more rooms than available, giving away rooms for free, and not charging the correct amount).

In Example 3, the employer could have asked the employee if he needed a reasonable accommodation to address the performance problems, but the employer was not obligated to do so. An employee with a disability generally has the responsibility to ask for a reasonable accommodation. See infra Question 14 and n.53 and accompanying text.

[17] See TAM, supra note 7, at VII (7.7) ("An employer should not give employees with disabilities "special treatment." They should not be evaluated on a lower standard . . . than any other employee. This is not equal employment opportunity.")

[18] Cf. Question 26 in EEOC, Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities (March 25, 1997) available at www.eeoc.gov/policy/docs/psych.html [hereinafter Psychiatric Disabilities] (modifications in how supervisors provide guidance and feedback may assist employees in improving job performance).

[19] An employer cannot penalize an employee for work missed while the employee took a significant amount of leave as a reasonable accommodation. See Reasonable Accommodation, supra note 11, at Question 19, Example A. An employer that accurately evaluates the quality and quantity of work produced by an employee when present is not penalizing the employee for work missed while taking leave as a reasonable accommodation. An employer may wish to consider postponing a performance evaluation or providing an interim one when a significant amount of leave affects overall productivity.

[20] See TAM, supra note 7, at VII (7.7) ("A disabled employee who needs an accommodation . . . in order to perform a job function should not be evaluated on his/her ability to perform the function without the accommodation"); cf. "Discrimination in Organizations," supra note 1, at 102 ("[P]erformance norms should permit some latitude for expressing individuality and should not be arbitrarily based on a singular cultural perspective. Utilizing outcome-based performance measures rather than process-based performance measures may help minimize discrimination . . .") (cites omitted).

[21] See Jay v. Intermet Wagner, Inc., 233 F.3d 1014, 1017 (7th Cir. 2000).

[22] See Reasonable Accommodation, supra note 11, at Question 41.

[23] See id. at Question 4.

[24] See id. at n. 103.

[25] See Hill v. Kansas City Area Transp. Auth., 181 F.3d 891, 894 (8th Cir. 1999) (request for reasonable accommodation is too late when it is made after an employee has committed a violation warranting termination); Contreras v. Barnhart, EEOC Appeal No. 01A10514 (February 22, 2002) (decision rejects employee's claim that employer should have known that a reasonable accommodation was not working and provided another one, rather than disciplining employee for poor performance, where employee failed to request a new accommodation and two of her doctors had indicated that the employer should continue providing the existing accommodation); cf. Fenney v. Dakota Minn. & E.R.R. Co., 327 F.3d 707, 717 (8th Cir. 2003) (employee took demotion to avoid risk of discharge for chronic tardiness after repeated requests for reasonable accommodation related to work schedule were summarily denied).

[26] See Reasonable Accommodation, supra note 11, at Questions 35-36.

27 See id. at Questions 5 and 36.

28 See id. at Questions 5-8.

29 See id. at Question 9.

30 See TAM, supra note 7, at VII (7.7).

31 Cf. id. ("An employer may not discipline or terminate an employee with a disability if the employer has refused to provide a requested reasonable accommodation that did not constitute an undue hardship and the reason for the unsatisfactory performance was the lack of accommodation.") In this Example, the employer may proceed with counseling Odessa, but if a reasonable accommodation could have been provided that would help Odessa resolve the performance problem (without causing undue hardship), any subsequent disciplinary action by the employer for the same problem would violate the ADA.

32 Cf. Traylor v. Horinko, EEOC Appeal No. 01A14117 (November 6, 2003) (employee failed to request reasonable accommodation for a disability with respect to any aspect of the PIP and instead waited until after he had failed the PIP and received notice of termination).

33 See TAM, supra note 7, at VII (7.7) ("A disabled employee who needs an accommodation . . . in order to perform a job function should not be evaluated on his/her ability to perform the function without the accommodation").

34 See Reasonable Accommodation, supra note 11, at Question 10.

35 See id.

Federal agencies should follow their internal reasonable accommodation procedures that outline how to handle a request for reasonable accommodation and the time frames for doing so. A PIP should generally be considered a situation requiring expedited handling of a request. See Question 13 in EEOC, Policy Guidance on Executive Order 13164: Establishing Procedures to Facilitate the Provision of Reasonable Accommodation (July 26, 2000) available at www.eeoc.gov/policy/docs/accommodation_procedures.html.

36 See Humphrey v. Memorial Hosp. Ass'n, 239 F.3d 1128, 1138 (9th Cir. 2001) (after employer and employee recognized that reasonable accommodation was not working, employer refused to engage in interactive process to consider whether another accommodation might be effective. Cf. Cutrera v. Board of Supervisors of La. State Univ., 429 F.3d 108, 113 (5th Cir. 2005) (employee's initial inability to propose a reasonable accommodation does not permit an employer to subvert the interactive process by terminating the employee before an accommodation can be proposed or considered).

37 See Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 863 (7th Cir. 2005); see also Degnan v. U.S. Postal Service, EEOC Appeal No. 01A53689 (March 23, 2006).

38 See 42 U.S.C. § 12112(b)(6) (2000); 29 C.F.R. §§ 1630.10, .15(c) (2007); see also Psychiatric Disabilities, supra note 18, at Question 30; Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1086 (10th Cir. 1997).

39 See Reasonable Accommodation, supra note 11, at Question 35. See also, Macy v. Hopkins Co. Sch. Bd. of Educ., 484 F.3d 357, 366 (6th Cir. 2007) (ADA permits an employer to fire an employee for conduct that results from a disability if that conduct disqualifies the employee from his or her job); Gambini v. Total Renal Care, Inc., d/b/a DaVita, Inc., 486 F.3d 1087, 1095 (9th Cir. 2007) (instructing jury that conduct resulting from a disability is part of the disability, and not a separate basis for termination, does not grant an employee absolute protection from adverse employment actions based on disability-related conduct because employers may show business necessity or direct threat to justify their disciplinary actions); Sista v. CDC IXIS N. Am. Inc., 445 F.3d 161, 172 (2d Cir. 2006) (citing to the EEOC's Enforcement Guidance on the ADA and Psychiatric Disabilities, the court stated that the ADA does not "require that employers countenance dangerous misconduct, even if [it] is the result of a disability"); Calef

v. Gillette Co., 322 F.3d 75, 87 (1st Cir. 2003) (ADA does not require that employer retain an employee whose disability causes unacceptable behavior – verbal and physical threats and altercations – that threatens the safety of others); Hamilton v. Sw. Bell Tel. Co., 136 F.3d 1047, 1052 (5th Cir. 1998) (ADA does not insulate emotional or violent outbursts blamed on an impairment); Siefken v. Arlington Heights, 65 F.3d 664, 666 (7th Cir. 1995) (termination appropriate for police officer who failed to control his diabetes, resulting in his driving erratically at high speed); cf. Mincer v. Alvarez, EEOC Petition No. 03990021 (May 25, 2000) (although medical evidence clearly established that employee's depression and anxiety did not cause insubordinate behavior, agency could have disciplined employee for this behavior even if a nexus had been established because the ADA permits employers to hold an employee with a disability to the same conduct standards as other employees as long as those standards are job-related and consistent with business necessity).

40 See 42 U.S.C. § 12112(b)(6) (2000); 29 C.F.R. §§ 1630.10, .15(c) (2007); see also Reasonable Accommodation, supra note 11, at Question 35 and Psychiatric Disabilities, supra note 18, at Question 30.

41 See Psychiatric Disabilities, supra note 18, at Question 30; see also, e.g., Macy v. Hopkins Co. Sch. Bd. of Educ., 484 F.3d 357, 366 (6th Cir. 2007) (school board had legitimate, nondiscriminatory reason to terminate teacher with a head injury who threatened to kill a group of boys).

42 See Bing v. Danzig, EEOC Petition No. 03990061 (February 1, 2000) ("[A] standard of employee work place conduct that bars insubordination by employees . . . is by definition job-related and consistent with business necessity."); Mincer v. Alvarez, EEOC Petition No. 03990021 (May 25, 2000) (employee's removal for insubordination is job-related and consistent with business necessity). See also Ray v. The Kroger Co., 264 F. Supp.2d 1221, 1229 & n.4 (S.D. Ga. 2003) (upholding termination of grocery clerk who had uncontrollable outbursts of profanity, vulgar language, and racial slurs as a result of Tourette Syndrome because such conduct impermissible in front of customers); and Buchsbaum v. Univ. Physicians Plan, 55 F.App'x 40, 45 (3d Cir. 2002) (unpublished) (no pretext where deaf employee's transfer and subsequent termination are justified by his unacceptable behavior that included inappropriate comments to patients). Cf. Crandall v. Paralyzed Veterans of Am., 146 F.3d 894, 895 (D.C. Cir. 1998) (information specialist's unacceptable behavior included abusing library employees of a trade association resulting in the library threatening to bar all of PVA's workers from using its facility); and Mammone v. President & Fellows of Harvard Coll., 847 N.E.2d 276 (Mass. 2006) (applying state disability law, upheld termination of museum receptionist with bipolar disorder for numerous unprofessional disturbances in front of visitors).

43 See, e.g., Calef , supra note 39, at 86 (it is job-related and consistent with business necessity for a manager to be able to handle stressful situations without making others in the workplace feel threatened by verbal and physical threats and altercations); Grevas v. Village of Oak Park, 235 F.Supp.2d 868, 872 (N.D. Ill. 2002) (employee with depression terminated, in part, because of inability to get along with coworkers as evidenced by refusing to establish effective working relationships, making unfounded allegations against coworkers, and making abusive and/or inappropriate comments). Cf. Psychiatric Disabilities, supra note 18, at Question 30 (example of a coworker courtesy rule that is not job-related and consistent with business necessity as applied to a warehouse worker who does not have regular contact with coworkers and who, because of a psychiatric disability, refuses to engage in casual conversation with coworkers and instead walks away when spoken to or gives a curt response).

44 See Hammel, supra note 37, at 863.

45 Cf. Den Hartog, supra note 38, at 1087 (permitting "employers carte blanche to terminate employees with mental disabilities on the basis of any abnormal behavior would largely nullify the ADA's protection of the mentally disabled").

46 Cf. Taylor v. Food World, Inc., 133 F.3d 1419, 1424 (11th Cir. 1998) (grocery clerk position inherently requires an ability to do the job without offending customers but summary judgment inappropriate because factual issue exists as to whether employee with autism could meet this requirement with or without reasonable accommodation); Ray, supra note 42, at 1229 & n.4 (the ADA does not require an employer to maintain indefinitely an employee who, because of Tourette Syndrome, uncontrollably subjects the employer's customers repeatedly to curse words and racial slurs).

47 See Reasonable Accommodation, supra note 11, at Question 25.

48 See Darcangelo v. Verizon Maryland, Inc., 189 F.App'x 217, 218 (4th Cir. 2006) (unpublished).

49 See Reasonable Accommodation, supra note 11, at Question 36. See also Buie v. Quad/Graphics, Inc., 366 F.3d 496 (7th Cir. 2004) (eleventh-hour declaration of disability does not insulate an unruly employee from the consequences of his misdeeds); Conneen v. MBNA Am. Bank N.A., 334 F.3d 318, 331-33 (3d Cir. 2003) (despite repeated warnings about tardiness and the threat of termination, employee failed to request a modified schedule until after she was terminated); and Hill, supra note 25, at 894 (request for reasonable accommodation is too late when it is made after an employee has committed a violation warranting termination).

50 See Reasonable Accommodation, supra note 11, at Question 41.

51 See id. at Question 5.

52 See id. at n.103.

53 See id. at Question 40; Psychiatric Disabilities, supra note 18, at Question 27.

54 Cf. Reasonable Accommodation, supra note 11, at Question 37.

55 See id. at Question 38.

56 See Crandall, supra note 42, at 898 (court rejected employee's claim that his rude behavior was so extreme as to put his employer on notice of a disability because a layperson cannot be expected to infer the existence of a psychiatric disorder given the general prevalence of rudeness).

57 See Reasonable Accommodation, supra note 11, at Questions 1-3, 40. See also Estades-Negroni v. Associates Corp. of N. Am., 377 F.3d 58, 64 (1st Cir. 2004) (employee's request for a reduced workload and an assistant before being diagnosed with depression did not constitute a request for reasonable accommodation); Russell v. TG Mo. Corp., 340 F.3d 735, 742 (8th Cir. 2003) (employer's knowledge that employee has bipolar disorder insufficient to support claim that employer should have known that employee's request to leave work immediately because she was "not feeling well" was related to her disability and therefore employee could be charged with an unexcused absence); Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1047 (6th Cir. 1998) (employer had no obligation to speculate on an employee's need for additional leave as a reasonable accommodation despite knowing the employee had a serious injury and wished to return to work eventually; employee never requested that her leave be extended when employer-provided leave ran out); Crandall, supra note 42, at 898 (court rejected employee's claim that his rude behavior was so extreme as to put his employer on notice of a disability because a layperson cannot be expected to infer the existence of a psychiatric disorder given general prevalence of rudeness). Cf. Wells v. Mutual of Enumclaw, 244 F.App'x 790, 791-92 (9th Cir. 2007) (unpublished) (employer had no duty to provide reasonable accommodation to employee who had angry outbursts due to Alzheimer's Disease and related dementia because employee never requested accommodation and employer's knowledge of disability did not mean it knew or had reason to know the disability might be preventing employee from requesting accommodation).

58 See 29 C.F.R. pt. 1630 app. § 1630.9 (2007); see also Reasonable Accommodation, supra note 11, at Question 41.

59 See TAM, supra note 7, at VII (7.7) ("An employer must provide an employee with a disability with reasonable accommodation necessary to enable the employee to participate in the evaluation process"); see also Reasonable Accommodation, supra note 11, at Question 14.

60 See Degnan, supra note 37. Although the EEOC found a failure to provide reasonable accommodation, the decision stated that this violation did not justify Degnan's physical and verbal rampage in response to the agency's failure to provide accommodation.

Case 1:16-cv-03422-OGB   Document 24-2   Filed 03/12/19   Page 29 of 32

61 Cf. Atkins v. Apfel, EEOC Appeal No. 02970004 (July 24, 2000) (agency failed to provide an effective reasonable accommodation and called into question the validity of its decision in a case when it denied request for an outside interpreter and instead insisted that the deaf employee being investigated for insubordination communicate through a staff interpreter, despite the fact that the agency knew the two individuals had an acrimonious relationship, the interpreter clearly had a stake in the outcome of at least two of the disciplinary matters, and the interpreter's competence was at issue).

62 42 U.S.C. § 12112(d)(4)(A) (2000); 29 C.F.R. § 1630.14(c) (2007). See Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 811 (6th Cir. 1999).

63 See Question 5 in EEOC, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA) (July 26, 2000), available at www.eeoc.gov/policy/docs/guidance-inquiries.html [hereinafter Medical Examinations].

64 All medical information obtained by an employer must remain confidential. This means an employer cannot commingle medical information with other personnel information, and can share medical information only in limited circumstances with supervisors, managers, first aid and safety personel, and government officials investigating compliance with the ADA. 42 U.S.C. §§ 12112(d)(3)(B), (4)(C) (2000); 29 C.F.R. § 1630.14(b)(1)(2007). See also n.10 and accompanying text in Medical Examinations, supra note 63.

65 See Williams v. Motorola, Inc., 303 F.3d 1284, 1291 (11th Cir. 2002) (employee's recent belligerent behavior, threats, and acts of insubordination were sufficient to justify requiring a medical examination); Sullivan, supra note 62, at 812 (employee's misconduct and insubordination gave the employer reason to seek further information about his medical fitness to continue teaching, particularly where prior to requesting the examination the employer sought input from a psychologist who suggested that an examination was in order); Ward v. Merck & Co., 226 F.App'x 131, 138-40 (3d Cir. 2007) (unpublished) (employer's request that employee undergo a psychiatric examination was job-related and consistent with business necessity where his behavior and job performance deteriorated after he returned from medical leave for treatment of a psychiatric illness).

66 See Sullivan, supra note 62, at 811; cf. Clark v. Potter, EEOC Appeal No. 01992682 (November 20, 2001) (while employer may have had grounds to discipline an employee who created a "toxic" work environment over a period of several years by taking notes on coworkers, providing supervisor with steady stream of (mostly baseless) complaints about coworkers, and showing an unwillingness to cease these actions, employer did not have a legal basis to order a psychiatric examination because no evidence indicated that employee had a medical condition that was causing him to perform poorly or posing a direct threat).

67 See Sista, supra note 39, at 173 (employer not obligated to pursue alternative diagnosis of employee's condition and its failure to do so confirms that its decision to fire employee did not depend on any perception of his mental state).

68 29 C.F.R. pt. 1630 app. § 1630.2(o) (2007) (leave as a reasonable accommodation under the ADA); 29 C.F.R. § 825.1 (2007) (medical leave required under the Family and Medical Leave Act of 1993).

69 Cf. Ward v. Massachusetts Health Research Inst., Inc., 209 F.3d 29, 35 (1st Cir. 2000) (while a fixed work schedule may be an essential function of most positions it was not so here because evidence showed that the employer had a flexible arrival policy permitting employees to arrive at work anytime between 7 and 9 a.m. as long as they worked a total of 7.5 hours each day and the employer failed to show that the plaintiff's job required him to arrive at a specific time each day).

70 Cf. Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1247 (9th Cir. 1999) (for summary judgment purposes, employer failed to show undue hardship in granting additional leave to employee who had been on medical leave for seven months and employer's policy permitted such leave for up to one year).

71 See Reasonable Accommodation, supra note 11, at Questions 17, 22; cf. Holly v. Clairson Indus.,

L.L.C., 492 F.3d 1247, 1258, 1260 (11th Cir. 2007) (because an employer cannot avoid its reasonable accommodation obligation by designating all functions as essential and factual issue exists as to whether the company's strict punctuality policy could be modified as a reasonable accommodation for an employee with paraplegia whose job did not require strict punctuality and who always made up the time); Cehrs v. Northeast Ohio Alzheimer's Research Ctr., 155 F.3d 775, 782 (6th Cir. 1998) (uninterrupted attendance not deemed an "essential function" because that would relieve an employer from having to provide unpaid leave as a reasonable accommodation).

72 See 42 U.S.C. § 12111(9)(B) (2000); see also Reasonable Accommodation, supra note 11, at Question 22.

73 See, e.g., Brenneman v. MedCentral Health Sys., 366 F.3d 412, 420 (6th Cir. 2004), cert. denied, 543 U.S. 1146 (2005) (pharmacist with diabetes absent at least 109 times over a 5-year period was unqualified because of excessive absenteeism); Conneen, supra note 49, at 331 (termination for excessive tardiness lawful where employee, who once was given a modified schedule as a reasonable accommodation, failed to request resumption of this accommodation when she again began arriving late due to morning sedation and instead gave her employer reasons unrelated to her disability for the late arrival); Amadio v. Ford Motor Co., 238 F.3d 919, 928 (7th Cir. 2001) (employer is not required to give an open-ended schedule to allow an employee to come and go as he pleases); Buckles v. First Data Resources, Inc., 176 F.3d 1098, 1101 (8th Cir. 1999) (employee with numerous absences unable to meet essential function of regular and reliable attendance); Carr v. Reno, 23 F.3d 525, 530 (D.C. Cir. 1994) (an employee is not qualified if he has prolonged, frequent, and unpredictable absences); Quinn v. Veneman, EEOC Appeal No. 01A34982 (December 21, 2004) (termination of employee with depression for repeated unexcused late arrivals was lawful where employee failed to provide medical documentation justifying any change in attendance requirements and evidence showed supervisor met with employee at least 20 times over a two-year period to discuss attendance problems); Lopez v. Potter, EEOC Appeal No. 01996955 (January 16, 2002) (employer did not have to excuse employee's persistent tardiness due to alcoholism and thus its use of progressive discipline, culminating in termination, was lawful).

74 See, e.g., Spangler v. Federal Home Loan Bank of Des Moines, 278 F.3d 847, 850 (8th Cir. 2002) (reassigning an absent employee's duties to coworkers resulted in the coworkers being unable to perform their own duties).

75 See, e.g. Rask v. Fresenius Med. Care N. Am., 509 F.3d 466, 470 (8th Cir. 2007) (dialysis technician who admitted that she could not come to work on a regular and reliable basis was not qualified); Brenneman v. MedCentral Health Sys., 366 F.3d 412, 420 (6th Cir. 2004), cert. denied, 543 U.S. 1146 (2005) ("excessive absenteeism" over several years rendered employee unqualified); Haschmann v. Time Warner Entertainment Co. L.P., 151 F.3d 591, 602 (7th Cir. 1998) ("it is not the absence itself but rather the excessive frequency of an employee's absences in relation to the employee's job responsibilities" that may determine if she is qualified); and Carr v. Reno, 23 F.3d 525, 530 (D.C. Cir. 1994) (an employee is not qualified if she has prolonged, frequent, and unpredictable absences).

76 While the EEOC and a minority of courts have focused on extended or indefinite leave as a matter of undue hardship, almost all circuit courts have instead held that indefinite leave is not a reasonable accommodation. Compare Reasonable Accommodation, supra note 11, at Question 44 (if an employer is able to show that the lack of a fixed return date causes an undue hardship, then it can deny the leave) and Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 648-50 (1st Cir. 2000) (plaintiff's request for a two-month extension of leave after 15 months of medical leave could be denied only if employer showed undue hardship) with Wood v. Green, 323 F.3d 1309, 1314 (11th Cir. 2003) (employer's granting of leave over the years showed that employee's disability was not improving and thus his repeated requests had become an unreasonable request for indefinite leave and a confirmation that he could not currently, or in the near future, be expected to perform his essential functions); Pickens v. Soo Line R.R., 264 F.3d 773, 777-78 (8th Cir. 2001) (request for leave was not reasonable where employee took leave 29 times in a 10-month period and sought to be allowed to work when he wanted); Walsh v. United Parcel Serv., 201 F.3d 718, 727 (6th Cir. 2000) (where an employer has provided substantial leave – here 18 months of paid and unpaid leave – a request for additional leave of a significant duration with no clear prospect for returning to work is not a reasonable accommodation); Walton v. Mental Health Assoc. of Southeastern

Pennsylvania, 168 F.3d 661, 671 (3d Cir. 1999) (while unpaid leave can be a reasonable accommodation, an employer is not required to provide repeated extensions of sick leave); and Cordell v. Cent. Tech., Inc., 162 F.3d 924, 928 (7th Cir. 1998) (employer does not need to provide indefinite leave as a reasonable accommodation for employee who has frequent, unpredictable absences, especially where employer has provide extended leave over a long period of time and other reasonable accommodations to give the employee every opportunity to perform her job).

[77] See Reasonable Accommodation, supra note 11, at Question 21, Example A.

[78] See id., supra note 11, at Question 17.

[79] See Taylor v. Pepsi-Cola Co., 196 F.3d 1106, 1110 (10th Cir. 1999).

[80] Compare Conneen, supra note 49, at 329 (employer cannot merely state that punctuality is important where no evidence demonstrates this proposition, such as tardiness affected quality of employee's performance or bank operations were harmed by her late arrival); with Earl v. Mervyns, Inc. 207 F.3d 1361, 1366 (11th Cir. 2000) (employer's handbook emphasized the importance of punctuality, it instituted a comprehensive system of warnings and reprimands for violation of the policy, and in this particular case, employee's job required that she report punctually at a certain time because she prepared the store before the arrival of customers and no other employees were assigned to do those duties).

[81] This publication does not address the extent to which an employer may need to modify dress and grooming standards to comply with Title VII of the Civil Rights Act of 1964 (e.g., to avoid discrimination on the basis of race or as a reasonable accommodation for an employee's religion).

[82] 42 U.S.C. § 12114(a) (2000) ("the term 'qualified individual with a disability' shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the entity acts on the basis of such use"); see also 42 U.S.C. § 12210(a) (2000) ("the term 'individual with a disability' does not include an individual who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use"). The ADA contains several other exclusions from the definition of "disability" (e.g., kleptomania, compulsive gambling, and sexual disorders such as voyeurism and pedophilia). See 42 U.S.C. § 12211.

[83] 42 U.S.C. § 12210(b) (2000); see also EEOC, Compliance Manual Section on Definition of the Term Disability, Sec. 902.6 (March 14, 1995), available at www.eeoc.gov/policy/docs/902cm.html.

[84] 42 U.S.C. § 12114 (c)(4) (2000). The ADA definitions of "disability" may include a person who is an alcoholic or recovering alcoholic, as well as a person who: (1) is a recovered drug addict, (2) has ceased engaging in the illegal use of drugs, and (3) is either participating in a supervised rehabilitation program or has been rehabilitated successfully. See 42 U.S.C. §12210(b) (2000). Regardless of coverage under the ADA, an individual's alcoholism or drug addiction cannot be used to shield the employee from the consequences of poor performance or conduct that result from these conditions.

[85] Hernandez v. England, EEOC Appeal No. 01A41079 (March 30, 2004); see also Bekker v. Humana Health Plan, Inc., 229 F.3d 662, 672 (7th Cir. 2000) (upholding termination of physician for treating patients while under the influence of alcohol); Maddox v. Univ. of Tenn., 62 F.3d 843, 848 (6th Cir. 1995) (upholding employee's termination because although alcoholism may have compelled employee to drink, it did not force him to drive or engage in other inappropriate conduct).

[86] 42 U.S.C. § 12114(c)(1) (2000).

[87] 42 U.S.C. § 12114 (c)(3) and (5) (2000).

[88] See note 82, supra.

[89] See Johnson v. Babbitt, EEOC Docket No. 03940100 (March 28, 1996); and n.103 in Reasonable Accommodation, supra note 11. See also Longen v. Waterous Co., 347 F.3d 685, 689 (8th Cir. 2003) (a

last chance agreement is valid where an employee receives something of value – e.g., employer does not terminate him for conduct – in exchange for the employee's voluntary agreement to refrain from using alcohol or drugs); Mararri v. WCI Steel, Inc., 130 F.3d 1180, 1181 (6th Cir. 1997) (pursuant to terms of a last chance agreement, employee fired after he failed a test for alcohol use).

90 Many states and localities have disability anti-discrimination laws and agencies responsible for enforcing those laws. EEOC refers to these agencies as "Fair Employment Practices Agencies (FEPAs)." Individuals may file a charge with either the EEOC or a FEPA. If a charge filed with a FEPA is also covered under the ADA, the FEPA will "dual file" the charge with the EEOC but usually will retain the charge for investigation. If an ADA charge filed with the EEOC is also covered by a state or local disability discrimination law, the EEOC will "dual file" the charge with the FEPA but usually will retain the charge for investigation.

---

*This page was last modified on January 20, 2011.*

 Return to Home Page