UNREPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 11

September Term, 2016

---

HEATHER FLANARY

v.

BALTIMORE COUNTY, MARYLAND, ET
AL.

---

Meredith,
Graeff,
Leahy,

JJ.

---

Opinion by Graeff, J.
Concurring opinion by Leahy, J.

---

Filed: February 27, 2017

---

*This is an unreported opinion, and it may not be cited in any paper, brief, motion, or other document filed in this Court or any other Maryland Court as either precedent within the rule of stare decisis or as persuasive authority. Md. Rule 1-104.

Baltimore County Police Officer Heather Flanary ("Officer Flanary"), appellant, filed in the Circuit Court for Baltimore County a Motion for a Preliminary Injunction, seeking to compel Baltimore County and Chief of Police James Johnson (the "County"), appellees, to return her from administrative duties to her regular duties as a patrol officer. The circuit court denied the motion.

On appeal, Officer Flanary raises a single question for our review, which we have rephrased:

> Did the circuit court abuse its discretion in denying Officer Flanary's request for a preliminary injunction based on its finding that Officer Flanary did not meet her burden of proving the existence of the four factors governing injunctive relief?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 5, 2013, Officer Flanary, a Baltimore County Police Officer, was involved in a fatal police-involved shooting incident. She had responded to a call at a hotel, where a subject was soliciting women for sexual acts. When Officer Flanary and her partners arrived, they identified the subject, Arnet Meyers, and after running a warrant check, they discovered that he had an open warrant for child support obligations. When the officers brought the warrant to Mr. Meyers' attention, a struggle ensued, and Mr. Meyers attempted to take Officer Flanary's gun. Officer Flanary's partner shot Mr. Meyers in the back, and he died on top of Officer Flanary. Officer Flanary and the other officers were awarded the Silver Star for valor for their handling of the incident.

Following the incident, Officer Flanary was on leave for approximately one week.

After she was cleared by the Police Department's psychologist, Caren DeBernardo, Psy.D.,

Officer Flanary returned to full duty performing her routine patrol duties.

On August 27, 2013, Officer Flanary was at the police firing range for routine

qualification testing when she experienced an emotional reaction to the smell of gunpowder

and the sound of gunfire. Officer Flanary had not been in a situation where a weapon was

fired since the June incident. Although Officer Flanary was able to successfully test and

qualify that day, she was suspended, assigned clerical duties, and ordered to submit to a

fitness for duty evaluation by Dr. DeBernardo because of her emotional reaction.

On August 29, 2013, Dr. DeBernardo found that Officer Flanary was "currently not

fit for full duty as a police officer," and that, due to "her recent anxiety reaction during

shooting practice, she is not currently able to safely perform the essential functions and

duties required of this position." Dr. DeBernardo recommended that Officer Flanary be

assigned to administrative duties and "begin therapy with a cognitive behavior therapist to

learn relaxation techniques and cope with the anxiety associated with [the] shooting."

Dr. DeBernardo noted that Officer Flanary's "prognosis is good," but that, because of the

"significant anxiety reaction when shooting at the range," she should engage in "additional

shooting practice coupled with therapy to ensure she is safe to return to patrol and respond

appropriately in an actual shooting incident." Dr. DeBernardo suggested that when

Officer Flanary's "treating providers and the range instructors believe she has made

maximum psychological improvement," she should receive another "fitness-for-duty

evaluation."

2

On October 3, 2013, Officer Flanary began mental health treatment with Samuel Yaffe, PhD., and attended therapy as he recommended. Dr. Yaffe also had Officer Flanary engage in practice at the shooting range. In March 2014, Dr. Yaffe released Officer Flanary to return to full duty, and Dr. DeBernardo cleared her to return to full duty performing her routine patrol duties.

Officer Flanary continued in therapy with Dr. Yaffe for a few more months until Dr. Yaffe discharged her in July 2014. At that time, with Officer Flanary's permission, Dr. Yaffe provided the police department with a brief letter, dated July 10, 2014, summarizing her course of treatment. In the letter, Dr. Yaffe summarized Officer Flanary's treatment, noting that Officer Flanary had been "extremely well engaged in the process" and "highly motivated to resolve her problem and return to her regular duties." Dr. Yaffe further observed that if Officer Flanary's "diligence, openness, honesty, and effort were typical of the Baltimore County Police Department, it would make [him] feel much safer as a resident of that county."

Following her discharge from therapy and her return to full duty as a patrol officer, Officer Flanary's performance was "good to excellent." She had "exceptional" ratings in the patrol and enforcement elements of her duties and was awarded Officer of the Month in January 2015.

During Officer Flanary's therapy with Dr. Yaffe, he informed Officer Flanary that the County was not paying him for his services. Dr. Yaffe inquired and was told that his bills would not be paid unless Officer Flanary filed a workers' compensation claim. After learning this, Officer Flanary filed a claim and continued with her treatment with Dr. Yaffe.

3

In March 2015, in connection with the workers' compensation proceedings, Officer Flanary was evaluated by Patrick J. Sheehan, M.D., who was retained by Officer Flanary.  We will not detail what was in that report, other than to say that Dr. Sheehan concluded that Officer Flanary had moderate, post-traumatic stress disorder (PTSD).  He concluded that she was fit for duty, but he recommended that she be seen monthly for the following year by Dr. Yaffe.

The police department also had Officer Flanary evaluated by its expert, Christiane Tellefsen, M.D.  In April of 2015, Dr. Tellefsen evaluated Officer Flanary.  Again, we will not detail her findings, other than to say that she also found that Officer Flanary had PTSD, largely resolved.

On June 18, 2015, a hearing was held before the Workers' Compensation Commission.  At the hearing, Officer Flanary testified about her difficulties stemming from the shooting incident, which included "falling asleep and staying asleep at night."  She also stated that she had "bad dreams" and flashbacks" of the shooting, and the incident was "very upsetting."  She also experienced difficulty concentrating, at times, and increased irritability.  She stated that she was not taking any medication or receiving any treatment, and her symptoms had no impact on her ability to perform her duties.  Counsel for the police department proffered, at the request of the hearing officer, that Officer Flanary's supervisor, Sergeant Jeffrey Kennedy, who was in the hallway waiting to be called, would testify that he had "been supervising [Officer Flanary] for three years . . . and that there's been no performance issues at work.  That she actually . . . her performance or traffic stops are actually twice the unit's average," and there were "no complaints" regarding her job

4

performance. Following the hearing, Officer Flanary received an award from the Workers' Compensation Commission for her PTSD. The County did not appeal.

On September 11, 2015, a couple of months after the workers compensation hearing, Officer Flanary received a phone call from the County's Office of Human Resources, informing her that she had been scheduled for a "fitness of duty" evaluation with Dr. DeBernardo.[1]  On September 25, 2015, Officer Flanary attended the evaluation because she "wanted to remain cooperative and . . . felt confident in [her] ability to perform [her] job." She declined, however, to sign a release of medical information form because she believed it violated her rights under the Americans with Disabilities Act ("ADA").

Dr. DeBernardo testified that her understanding was that Officer Flanary had been referred for an evaluation because she stated during her workers' compensation hearing that she "was still having symptoms of PTSD related to the 2013 incident," and therefore, she was referred so that Dr. DeBernardo could "make sure that she was fit for duty." Prior to the evaluation, Dr. DeBernardo was provided with a transcript of the workers'

---

[1] The County asserts, without citation to the record, that:

> Due to bureaucratic delay within the County, and delays in getting the transcript of the workers compensation hearing, Chief Johnson was not informed of Flanary's testimony and the experts' diagnoses until early September. However, upon receiving this information he was greatly concerned about Flanary's fitness for duty as an armed police officer. Chief Johnson felt it was incumbent upon him to request that Flanary have another follow up evaluation with Dr. DeBernardo. Therefore, on September 11, [2015,] Flanary was informed by telephone and email that she was scheduled for a follow-up evaluation.

As Officer Flanary notes in her Reply Brief, this excerpt "is not from record evidence."

compensation hearing, and the letters and reports from Drs. Yaffe, Tellefsen, and Sheehan. In addition to reviewing those documents, Dr. DeBernardo also conducted another session with Officer Flanary, consisting of an interview and psychological testing. After that evaluation, Dr. DeBernardo recommended to the police department that Officer Flanary "continue at full duty as a police officer." She recommended, however, that because Officer Flanary continued to experience some symptoms related to the 2013 trauma, "she would likely benefit from returning to therapy to address these ongoing symptoms. There is concern that if [Officer] Flanary is involved in another traumatic incident on the job, that her symptoms will increase and her functioning will decrease."

In October 2015, Officer Flanary was named "Police Officer of the Month," in her precinct. In a favorable performance evaluation appraising her performance from "10/1/2014 to 9/30/2015," Officer Flanary again earned "exceptional" ratings in several categories.

Following Dr. DeBernardo's evaluation, Officer Flanary remained on full duty as a patrol officer. On November 6, 2015, she received another order from the County's Office of Human Resources, which provided that "James W. Johnson, Chief, Baltimore County Police Department has made a mandatory referral for you to comply with therapy/treatment recommendations made by Dr. Caren DeBernardo," as a result of the September 25, 2015 evaluation. Officer Flanary signed the order, acknowledging receipt. She declined, however, to sign an "Authorization For Release of Confirmation of Compliance with Treatment," which provided: "I further authorize Dr. Caren DeBernardo to discuss my treatment and progress with the above provider, and with Baltimore County's Office of

6

Human Resources personnel, as needed, regarding my fitness for duty" because she "felt like it violated [her] ADA rights." Although Officer Flanary did not believe the November 6, 2015, order was lawful, she "wanted to remain cooperative and in the good graces of [her] supervisor," so she returned to Dr. Yaffe for therapy. She subsequently provided to Frances Butcher, Chief of Personnel for the County's Office of Human Resources, a letter from Dr. Yaffe, indicating that she had attended therapy on November 19, 2015, and December 17, 2015, and that she had "been most cooperative."

On January 21, 2016, the police department issued another "Fitness for Duty Evaluation" order to Officer Flanary,[2] which provided as follows:

> On September 25, 2015 you were subject to a Psychological Consultation – Fitness for Duty evaluation conducted by Dr. Caren DeBernardo. You have been provided a copy of Dr. DeBernardo's report and recommendations for treatment.
>
> You are hereby notified that as a mandatory condition of your assignment as a full duty Police Officer you are required to:
>
> - Comply with the treatment recommendations as specified by Dr. Caren DeBernardo;
>
> - Provide, before the close of business on January 29, 2016, the name, address, phone and fax numbers of your treating provider(s) to Baltimore County Government Director of Human Resources, George E. Gay;
>
> - Authorize the Baltimore County Office of Human Resources to deliver copies of Dr. DeBernardo's Fitness For Duty report and recommendations for treatment to your treating provider(s);

---

[2] The order is undated, but the email from the Office of Human Resources to Colonel Alexander Jones, directing him to present the order to Officer Flanary, is dated January 21, 2016.

- Authorize your treating provider and psychiatrist to disclose your attendance or non-attendance to scheduled appointments and time frame necessary to complete the recommendations for treatment, not to include diagnostic and/or clinical information, to George E. Gay, Director of Human Resources, and Frances R. Butcher, Chief of Personnel Section, Office of Human Resources;

- Authorize your treating provider to correspond with Dr. DeBernardo to include: confirmation that you have initiated treatment; at two months confirming your active participation in treatment; at four months stating your progress with symptoms; and when you have reached maximum improvement in treatment; and

- Participate in a follow up evaluation with Dr. DeBernardo as scheduled by the Office of Human Resources.

On January 28, 2016, Officer Flanary responded that she had completed Bullet 1, and with respect to Bullet 2, she had provided Dr. Yaffe's letter confirming her return to therapy. She stated that she declined to comply with Bullets 3-6 because the order violated her rights under the ADA.

On February 1, 2016, Officer Flanary's next scheduled shift, she was notified by her immediate supervisor, Sergeant Kennedy, that she was to return to the police station. When she did so, she was informed that she was "going to be put on desk duty until further notice," with "no prisoner contact." Officer Flanary interpreted this to mean that she "would be on the desk and perform clerical duties," answering telephone calls and handling citizen complaints.

On February 3, 2016, Officer Flanary filed a Verified Complaint for Writ of Mandamus/Prohibition, Declaratory Relief, and Temporary and Permanent Injunctive Relief. On the same date, the court granted a temporary restraining order, ordering that:

8

([i]) defendants Baltimore County, Baltimore County Police Department and Chief of Police Johnson are restrained and enjoined from enforcing the orders of November 6, 2015, January 21, 2016, and February 1, 2016;

(ii) defendants Baltimore County Police Department and Chief of Police Johnson shall immediately rescind the orders of November 6, 2015, January 21, 2016, and February 1, 2016;

(iii) defendants Baltimore County, Baltimore County Police Department and Chief of Police Johnson immediately reinstate Officer Flanary as a full duty Patrolman First Class assigned to the Essex precinct;

(iv) defendants Baltimore County, Baltimore County Police Department and Chief of Police Johnson are restrained and enjoined from conducting or compelling any further medical inquiries of Officer Flanary stemming from the June 5, 2013 incident;

(v) defendants Baltimore County, Baltimore County Police Department and Chief of Police Johnson are restrained and enjoined from ordering or compelling Officer Flanary from submitting to any medical or mental health treatment, and with open access, as a condition of employment or full duty status; and

(vi) defendants Baltimore County, Baltimore County Police Department and Chief of Police Johnson are restrained and enjoined from imposing any further discipline or imposing adverse terms, conditions and privileges of employment on Officer Flanary for her refusal to comply with unlawful orders and unlawful medical inquiries.

The court further ordered that the temporary restraining order would expire on February 12, 2016.

Immediately following the entry of the temporary restraining order, Officer Flanary returned to her regular patrol duties. On February 8, 2016, the County filed a Motion to Dissolve Temporary Restraining Order, arguing that that the order was entered *ex parte*, was "facially invalid," and did not contain the required findings regarding notice.

9

On February 10, 2016, the court held an evidentiary hearing on the motion for preliminary injunction. At the start of the hearing, counsel for the County argued that the County's motion to dissolve the temporary restraining order should be granted, for the reasons set forth in its motion. At the hearing, Dr. Sheehan's report, Dr. Tellefsen's report, and Dr. DeBernardo's reports were all admitted under seal. Dr. Yaffe's July 10, 2014, letter also was admitted. Officer Flanary testified and called several witnesses to testify on her behalf.

Officer Flanary testified that, while she is on "desk duty," she is not able to conduct any law enforcement activities. She stated that desk duty is an impediment to promotions and is stigmatizing to police officers. Officer Flanary viewed her assignment to desk duty as punishment for not signing the police department's order.

Officer Flanary acknowledged that she testified before the Workers' Compensation Commission that she had difficulty falling asleep and staying asleep at night, that she was still having bad dreams on a weekly basis, she was still having flashbacks about the incident, she thinks about the incident every day, and she had some difficulty concentrating and increased irritability. She agreed that she had refused to consent to the County's orders, as she believed the orders violated the ADA. Officer Flanary stated that she thought she had been "doing great," and if she thought she needed medical or mental health treatment, she would confer with her own doctors for recommendations.

Sergeant David Rose testified that desk duty is "used for officers who are pregnant" or who have "chosen to come off of the road and work," and it is "also used for light duty positions," or for officers "whose injuries, illnesses or conditions actually fit that job

10

description." He stated that desk duty is also used as informal discipline, explaining that officers are sometimes assigned to desk duty for "minor disciplinary issues, discourtesy," "complaints," "[d]riving too fast or not driving with care," and for suspicious use of sick leave. As informal discipline, desk duty is a way "to get your point across without going through the formal disciplinary process." An officer on desk duty cannot accumulate any statistics of enforcement.

Sergeant Kennedy, Officer Flanary's supervisor for approximately a year and a half, described her as "exceptional," stating that Officer Flanary's "strongest attributes are her maturity, her [self-motivated] teamwork approach to law enforcement," her productivity and her positive attitude. He did not have any concerns with Officer Flanary's performance or whether she was fit for duty. Officer Flanary had been nominated "at least twice for officer of the month," which was based on her performance, and she "sets the bar high as far as level of productivity from a patrol officer's perspective." Sergeant Kennedy had not seen any adverse impact from the shooting incident on Officer Flanary's job performance, and he had commented to Lieutenant Joseph Jamerson, the lieutenant who executed the desk duty order, that "one of [his] best officers is getting placed in a non-line position and getting put on the desk and being taken out of that role." According to Sergeant Kennedy, no one above him in the chain-of-command asked him any questions about whether he had observed Officer Flanary having any difficulties in performing her job functions. He agreed that he was not privy to any of Officer Flanary's psychological treatments or recommendations.

Lieutenant Jamerson testified that Officer Flanary's performance was spectacular and exemplary. No one above him in the chain-of-command had asked him about Officer Flanary's ability to perform her job functions in the previous six months. Generally, throughout the precinct, the view was that Officer Flanary "should just be working" on the road. He opined that "this stuff is coming out of the blue" because it seemed that Officer Flanary's performance was exceptional for "a year or more" and she had "no issues at all."

Precinct Commander Andre Kevin Davis testified that Officer Flanary is "one of the best officers we have in Essex," and there were no problems with her performance. Although he issued an order to Officer Flanary to comply with certain conditions, he had no involvement with the order substantively and was only following directions in serving it.

Colonel Alexander Jones testified that, on February 1, 2016, he directed Lieutenant Jamerson to issue the order directing Officer Flanary to be taken off the road and put on desk duty. His understanding of the order was that Officer Flanary had not complied with four points on an order, which concerned Chief Johnson, as Officer Flanary was refusing to comply with Dr. DeBernardo's recommendations. The February 1, 2016, order had not been rescinded because the police department wanted "to make sure that Officer Flanary is seeking treatment for her PTSD," as it is a "liability for the agency." He stated that, not only is treatment "important for her," it is also important for officer safety and the safety of the public. Although an officer who disobeys a direct order typically is subjected to formal discipline, Officer Flanary was instead assigned to desk duty.

12

The County called Dr. DeBernardo to testify as an expert in clinical psychology with a sub-specialty in law enforcement forensic psychology. Dr. DeBernardo is not an employee of the police department, but a consultant working on a contractual basis. In that capacity, among other things, she conducts "fitness for duty evaluations" of police officers. She explained that the goals of a fitness-for-duty exam are to determine whether the employee has a "mental health issue that would relate to their ability to do their job." Particularly with respect to police officers, the exam "involves the health, safety and welfare of others, the officer and the Department and, of course, the public in general."

In August 2013, Dr. DeBernardo examined Officer Flanary and concluded that she did not meet the criteria of post-traumatic stress. She did, however, have an "anxiety reaction to the shooting, which was, of course, concerning since she was a full duty police officer, and [Dr. DeBernardo's] concern was we didn't want her to have a situation where she might have to pull her weapon in a real life situation if that happened in training." Despite not diagnosing Officer Flanary with PTSD at that time, Dr. DeBernardo recommended that she work administrative duty until she had treatment to address her anxiety, as Dr. DeBernardo "did not want there to be any public safety risk." She explained that a public safety risk could occur if Officer Flanary used her weapon unnecessarily or froze in a situation where she needed to use her weapon.

Ms. Butcher, Chief of Personnel for the County's Office of Human Resources, testified that, in September 2015, the Chief of Police requested that Officer Flanary be scheduled for a fitness of duty exam. On September 25, 2015, Dr. DeBernardo again

13

evaluated Officer Flanary to determine her psychological fitness for duty. She made the following recommendations:

> 1) Ms. Flanary is fit for duty as a police officer with Baltimore County Police Department. She continues to experience some symptoms related to the 2013 trauma but has been functioning well on her job and in her personal life. She is able to safely perform the essential functions and duties required of this position. However, she would likely benefit from returning to therapy to assess these ongoing symptoms. There is concern that if Ms. Flanary is involved in another traumatic incident on the job, that her symptoms will increase and her functioning will decrease.

> 2) Ms. Flanary should return to therapy to address irritability, social withdrawal, sleep disturbance, and intrusive thoughts associated with the incident.

On October 21, 2015, Ms. Butcher emailed Dr. DeBernardo to ask for further clarification regarding whether her recommendation that Officer Flanary return to therapy meant that she was "fit to continue working, contingent upon her attending therapy to address ongoing symptoms related" to the incident. Ms. Butcher asked that Dr. DeBernardo clarify certain issues.

The following day, Dr. DeBernardo responded. Although we do not include the contents of the entire letter, we note that, due to Officer Flanary's lingering symptoms of PTSD, Dr. DeBernardo stated that the referral to treatment should be "a mandatory referral to treatment[,] which should begin as soon as possible." She stated that, when Officer Flanary's treating provider felt that she had "made maximum improvement in treatment and no longer require[d] further treatment," she could be scheduled to see Dr. DeBernardo again. While Officer Flanary was "in this monitoring process," any incidents or problematic behavior should be reported to "re-assess duty status."

Dr. DeBernardo explained that it was important for Officer Flanary to come back to see her after reaching maximum improvement so that she could "make sure that everything went well in treatment and that the symptoms were cleared up and that there was no public safety risk." She explained that maximum improvement does not necessarily mean an officer is fit for duty, as that term relates to workers' compensation determinations, as opposed to fitness for duty determinations. Dr. DeBernardo stated that the bullet points in the police department's order encompassed her recommendations.

On November 6, 2015, Ms. Butcher met with Officer Flanary, Captain Davis, and Lieutenant Jamerson to provide Officer Flanary with the fitness for duty exam report and Dr. DeBernardo's recommendations. Ms. Butcher stated that it was "a very positive meeting," and although Officer Flanary was understandably nervous when she came to the meeting, Ms. Butcher assured her that she was not in trouble, and the purpose of the meeting was to review Dr. DeBernardo's recommendations and Chief Johnson's "concern that she be restored to a hundred percent." They acknowledged that Officer Flanary's work was good, and she would remain on full duty while she followed the recommendations.

Officer Flanary requested that she be able to go see Dr. Yaffe again, as she felt comfortable with him. Officer Flanary was "very cooperative" and "very receptive to the idea of going back to Dr. Yaffe[]." Ms. Butcher provided Officer Flanary with an authorization and release and asked her to have Dr. Yaffe authorize the release of "confirmation of . . . compliance with the recommendations for treatment and therapy to" Ms. Butcher and to authorize Dr. DeBernardo to "discuss [her] treatment and progress" with Dr. Yaffe and the County Office of Human Resources personnel "as needed regarding

15

[her] fitness for duty." Ms. Butcher never received a signed authorization from Officer Flanary.

Because Ms. Butcher did not receive the authorization, the County Office of Human Resources and Chief Johnson could not confirm that Officer Flanary was following up on Dr. DeBernardo's recommendations. Ms. Butcher left Officer Flanary "a couple messages," asking her to have Dr. Yaffe complete the authorization and send it back so that they knew she was in compliance. Ms. Butcher later learned that Officer Flanary was reluctant to have the authorization completed because she "was concerned . . . that her medical records would be released to the Office of Human Resources." Due to Officer Flanary's concern, Ms. Butcher revised the authorization form to indicate that the Office of Human Resources "was looking for confirmation of attendance to appointments, and was not asking for any clinical or diagnostic information, and to continue to be able . . . to have the doctors she's seeing communicate with" Dr. DeBernardo. Accordingly, she revised the second paragraph of the authorization to authorize Dr. Yaffe to "release confirmation of [her] attendance to scheduled appointments and guesstimated time frame necessary to complete the recommendations for treatment/therapy, not to include diagnostic and/or clinical information to" Ms. Butcher, and to authorize Dr. DeBernardo to discuss her treatment with Dr. Yaffe. Officer Flanary did not return the authorization to the Office of Human Resources.

Ms. Butcher advised Chief Johnson that Officer Flanary had not provided the authorization for release to the Office of Human Resources. She had received a note from Dr. Yaffe that Officer Flanary had been to see him and had been cooperative. Ms. Butcher

16

then scheduled a meeting with Chief Johnson, two County attorneys, and the Director and Deputy Director of Human Resources to discuss "how we were going to handle this situation of the noncompliance." It was decided that, as a "mandatory condition of her assignment as a full-duty police officer," Officer Flanary would be required to comply with the conditions in the January 21, 2016, order.

In argument to the court, counsel for Officer Flanary stated that the County had presented no evidence of "any actual performance issue on the job or . . . any present concern that [Officer Flanary's] ability to perform her essential job functions is impaired by a medical condition." Counsel asserted that, unless there was evidence "to meet the high legal standards" that Officer Flanary was a risk, the County's public safety argument must fail. Counsel argued that, under the ADA, an employer must have evidence that the employee presented a "significant risk of substantial harm that cannot be eliminated or reduced by reasonable accommodations," in order to require an "employee to divulge this confidential medical information," and such evidence was not presented in that case. Putting Officer Flanary on desk duty until she complied with the order was punitive and "patently violates the ADA and other laws." Counsel concluded that, "based on all the evidence," Officer Flanary had "clearly met the criteria for issuing a preliminary injunction," which would "ensure that Officer Flanary would be back" to full-duty. To "bench her for the duration of this litigation based on fears, myths, generalizations and worries about some potential future trauma" "would certainly [irreparably] harm her career, her well-being and her opportunity to advance and have the full privileges of a . . . police officer."

The County argued that injunctive relief should be denied summarily. It argued that the Chief of Police had "a very reasonable and lawful order that simply requires Officer Flanary to allow her treating provider to communicate with our department psychologist about the progress of her treatment and to agree to see Dr. De[B]ernardo when she is released from that treatment," and courts should not second guess police departments in personnel decisions relating to the mental health of officers. With respect to irreparable harm, the County asserted that the only "harm that's been attested to is Officer Flanary has been taken off the street and put on desk duty, and she really holds the keys to her alleged cell, in that all she need[s] to do is comply with the chief's order, and she will be back on the road." The County asserted that the ADA is not violated when an employer ensures that police officers are fit for duty, and that Dr. DeBernardo recommended that Officer Flanary needed continuing therapy to remain fit for duty. Dr. DeBernardo's recommendation was not based on the possibility of "the future," as Officer Flanary asserted, but instead, it was based on Officer Flanary's current symptoms, which were "very valid concerns." The County noted that it had "modified the release so that only Dr. De[B]ernardo is ever going to talk to" Dr. Yaffe. It asserted that it was in "full conformance with the ADA," and the County was "concerned about the officer's safety, her fellow officer's safety, and the safety of the public," which is why Dr. DeBernardo recommended that "these simple steps be followed."

The County asserted that Officer Flanary could not establish the four factors necessary for injunctive relief because: (1) "[b]eing placed on desk duty because of your own refusal to comply with a lawful order is self-imposed harm and it's not irreparable in

any case"; (2) "the second factor is an undermining of the chief's authority to see that his officers are fit for duty"; (3) "the third factor, likelihood of success on the merits . . . police departments are not only entitled to but obligated to send officers for fitness for duty and follow through on that as necessary, because it's a vital business interest"; and (4) "public interest is that she be as safe as possible and all we're asking is that she allow her doctor to talk to our doctor and have a follow-up at the end with our doctor." The County suggested that:

> The status quo should be Officer Flanary follows the directives of the Chief of Police, or she is off the street; not under discipline, not with her police powers suspended, but off the street until she simply agrees that she will allow her doctor to talk to our doctor and follow-up with our doctor at the end of her treatment, which will hopefully be very successful.

At the conclusion of the hearing, the court made clear that it did not question that Officer Flanary had an exemplary record. It also found "that this incident in June of 2013 did impact [Officer Flanary] very much, and that it still affects her. It affected her with respect to testimony that she gave in the worker's compensation case. It affected her in testimony that she presented this morning." The court then stated:

> [W]e are involved here with a police officer, there is an issue, it cannot be swept under the rug of essentially public scrutiny.
>
> It seems like every night or every week there's another issue involving a police officer somewhere and how some members of the public seem to be, perhaps, looking for ways to bring police officers down. There's a legitimate concern on the part of the [County] as to what has happened to her with respect to the last couple of weeks being essentially taken off the street as a patrol officer and put at a desk.
>
> I also understand the County's concern, however, and my thinking is that although we cannot predict the future and [counsel for Officer Flanary] may say that it's speculative to do so, based on the facts that have been

19

presented, my thinking is it only takes one. It only takes one time for
something to happen that can essentially be a real problem and issue for not
only, perhaps, Officer Flanary, but for the Baltimore County Police
Department and, therefore, Baltimore County. That is shown just from the
incident itself in June of 2013.

The court then found that, "based on my review of what has been submitted[,] . . .

that there is a business necessity here, that police officers do need to be as near a hundred

percent as they can be given the incredible responsibility and duties that they have to serve

the public." It found that the reassignment of Officer Flanary was not retaliation in the

sense of punishment, but rather, "it's simply an effort to have her taken off the street to

essentially be in compliance with the recommendation of Dr. De[B]ernardo as to the

ongoing symptoms that . . . Officer Flanary continues to have." The court continued:

> I find that the County did essentially try to work with Officer Flanary
> with her concerns about disclosure of medical information, private
> information, and worked to reduce the original requirements in the various
> release documents that have been seen and admitted in this case.
>
> I find that there are safety issues here, as you may have inferred from
> my comments earlier. I'm not making a pun or trying to be glib, but not
> knowing whether something may trigger some issues with Officer Flanary,
> again, maybe the sound of a gun, the smell of gunpowder or other issues that
> may, again, produce some type of issues with her that may affect her job
> performance.
>
> * * *
>
> I find that Chief Johnson, based on the testimony that I've heard, and
> I think that it's clear that he did make a decision in this matter that was
> essentially conveyed down the chain of command that ultimately ended up
> with . . . Officer Flanary being given a desk assignment; that Chief Johnson
> does wish to have, based on what I've heard, wishes to have Officer Flanary
> restored to 100 percent.

Based on those factual findings, the court then ruled as follows:

20

I find, therefore, that the Plaintiff has not met her burden with respect to the four . . . prongs of the law governing injunctive relief; that the irreparable harm that's been described, I don't find that there has been such irreparable harm to the Plaintiff.

She was not suspended, her duties were not suspended or her police powers were not suspended, she was not threatened with being fired or reduced in any other capacity other than to have her comply with what was in my view a reasonable request, a noninvasive request by the County. Also the likelihood of harm to the Defendant, I think I've explained that I do have concerns about incidents that could happen and, again, with Chief Johnson being at the top, essentially all the attention would go there, also with the climate that the public seems to have generally with police officers that we hear about in the media.

As to the likelihood that the Plaintiff would succeed on the merits, I don't find that she has met her burden that there is such a likelihood. Also, the public interest for, I think, again, I explained that there's public interest in . . . all police officers who carry weapons.

I mean, that's something I may not have mentioned, but obviously police officers are issued service weapons and that they – that is a factor that has to be considered too.

So I find that that prong has not been met, therefore, the petition or the proposed preliminary injunction is denied.

The court also granted the County's motion to dissolve the temporary restraining order. The remaining claims, seeking mandamus, declaratory judgment, and permanent injunctive relief, have been stayed by consent pending this appeal.

## DISCUSSION

Officer Flanary contends that "[t]he trial court abused its discretion by denying [her] request for a preliminary injunction because all four factors required for a preliminary injunction were met, and the injunction would have preserved the status quo allowing [her] to remain on full duty patrol assignment." The County, by contrast, contends that Officer

Flanary "failed to establish even one" of the four factors that she was required to establish

to prevail on her motion for a preliminary injunction.

The purpose of "a preliminary injunction is to preserve the status quo between the

parties, pending a hearing on the merits." *Maloof v. State, Dep't of Env't,* 136 Md. App.

682, 692 (2001). Injunctive "relief is designed to preserve the status quo from future acts

so as not to undermine the final disposition of the case on the merits." *Ehrlich v. Perez,*

394 Md. 691, 735 (2006).

The Court of Appeals has explained the scope of appellate review of a circuit court's

grant or denial of a preliminary injunction, as follows:

> "Our review of a preliminary injunction is limited because we do not
> now finally determine the merits of the parties' arguments." *LeJeune v. Coin
> Acceptors, Inc.,* 381 Md. 288, 300 (2004) (citing *Department of
> Transportation v. Armacost,* 299 Md. 392, 404 (1984)) (Internal quotations
> omitted). We review only whether the trial court properly granted [or denied]
> the preliminary injunction. *Fogle v. H & G Restaurant,* 337 Md. 441, 456
> (1995).

*Ehrlich,* 394 Md. at 707. "[I]t is a rare instance in which a trial court's discretionary

decision to grant or to deny a preliminary injunction will be disturbed by this Court." *Id.*

(quoting *State Dep't v. Baltimore County,* 281 Md. 548, 550 (1977)).

In determining whether to grant or deny a preliminary injunction, the trial court must

assess the following four factors:

> (1) the likelihood that the plaintiff will succeed on the merits; (2) the "balance
> of convenience" determined by whether greater injury would be done to the
> defendant by granting the injunction than would result from its refusal;[1] (3)
> whether the plaintiff will suffer irreparable injury unless the injunction is
> granted; and (4) the public interest.

*Id.* at 708 (quoting *Armacost*, 299 Md. at 404-05). The party seeking a preliminary injunction has the burden of producing facts necessary to satisfy each of these factors. *Fogle*, 337 Md. at 456. The "failure to prove the existence of even one of the four factors" precludes the grant of injunctive relief. *Id.*

Here, the circuit court found that Officer Flanary failed to satisfy any of the four factors. As indicated, the failure to prove even one factor supports a trial court's conclusion to deny a motion for a preliminary injunction. We apply the "deferential abuse of discretion standard to a trial judge's ruling involving a balancing of interests." *Ehrlich*, 394 Md. at 708.

We are not persuaded that the circuit court in this case abused its discretion in finding that the public interest factor did not support Officer Flanary's request for a preliminary injunction. The circuit court noted that police officers have "incredible responsibility and duties" in serving the public, and therefore, they must be "near a hundred percent." *See Makinen v. City of N.Y.*, 53 F. Supp. 3d 676, 694 (S.D.N.Y. 2014) (police officers "occupy safety-sensitive positions which require the carriage and usage of deadly weapons," "undeviating concentration," "split-second good judgment," and "self-control," as well as the ability to tolerate "a high degree of danger, [and] periods of enormous physical and emotional stress," and "given these essential functions, police officers who are suffering from alcohol dependence or abuse . . . constitute a direct threat to themselves or others.") (internal citations omitted). Given Dr. DeBernardo's recommendation, and the potential injury to the public, Officer Flanary, and other officers, if Officer Flanary was unable to act appropriately if a shooting or other act of violence occurred, we cannot say

23

–Unreported Opinion–

that the circuit court's decision finding that the public interest was best served by denying

the request for preliminary relief was so removed from any center mark to constitute an

abuse of discretion.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

<u>UNREPORTED</u>

<u>IN THE COURT OF SPECIAL APPEALS</u>

<u>OF MARYLAND</u>

No. 11

September Term, 2016

---

HEATHER FLANARY

v.

BALTIMORE COUNTY, MARYLAND, ET
AL.

---

Meredith,
Graeff,
Leahy,

JJ.

---

Concurring Opinion by Leahy, J.

---

Filed:  February 27, 2017

The majority opinion is consistent with the highly deferential standard of review we must apply in reviewing a trial court's grant or denial of a preliminary injunction. *Ehrlich v. Perez*, 394 Md. 691, 735 (2006). I write separately to emphasize that by affirming the judgment of the circuit court in this procedural posture, this Court does not necessarily endorse the circuit court's findings. As the majority opinion points out, the law imposes a heavy burden on the party seeking a preliminary injunction to satisfy all four factors set forth in *Armacost*. *See Dep't of Transp., Motor Vehicle Admin. v. Armacost*, 299 Md. 392, 404–05 (1984) (citing *State Dep't of Health & Mental Hygiene v. Baltimore Cty.*, 281 Md. 548, 554–57 (1977)). And, as the majority opinion rightly concludes, we cannot say that the court's decision that the public interest factor did not support Officer Flanary's request for preliminary injunction was "so removed from any center mark to constitute an abuse of discretion."

Still, I am compelled to write that based on the facts presented in this record, I do not follow how the circuit court determined that Officer Flanary failed to demonstrate that she would likely succeed on the merits. The Americans with Disabilities Act and Maryland anti-discrimination laws limit an employer's ability to require disability-related medical exams and divulge confidential medical information. *See* 42 U.S.C. § 12112(d)(4); Maryland Code (1984, 2014 Repl. Vol., 2016 Supp.), State Government Article ("SG"), § 20-606(a). An employer cannot "discriminate on the basis of disability against [an employee] with a disability with regard to: . . . (2) [h]iring, upgrading, promotion, tenure, demotion, transfer, layoff, termination, right of return from layoff, and rehiring;" "[l]imit, segregate, or classify a job applicant or employee in a way that adversely affects the

individual's employment opportunities or status, on the basis of disability;" or "[f]ail to make an individualized assessment of a qualified individual with a disability's ability to perform the essential functions of a job." Code of Maryland Regulations ("COMAR") §§ 14.03.02.04(A)(2), (B)(1), (B)(3); *cf. Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 219–220 (2016) (discussing anti-discrimination protections in the law for employees with disabilities). It is true that Officer Flanary has admitted to having bad dreams, flashbacks, and to being upset because a suspect—whom she and her partners were attempting to apprehend—was shot and killed right on top of her. But after more than 10 months of mental health treatment, it is difficult to fathom what else Officer Flanary could do to merit the right to retain or return to her job duties beyond passing the required fitness for duty examinations and receiving across-the-board "exceptional" performance ratings. Officer Flanary's supervisor testified that her performance, both before and after the incident, had been exemplary and the commanders around her could not explain why she was relegated to desk duty. The concern expressed by Dr. DeBernardo that "if [Officer] Flanary is involved in another traumatic incident on the job, that her symptoms will increase and her functioning will decrease" appears to be based on a contingency which, if it were to occur in the future, may *then* warrant removing Officer Flanary from full duty status. I do not question the Department's right and obligation to ensure their officers are fit for duty— indeed, not only is the issue one that is vital to the operation of police departments, it is clearly also a vital matter of public safety. But the enigma in this case is, how, then, did Officer Flanary pass her fitness for duty exams? Under the facts presented thus far, I cannot agree that Officer Flanary cannot demonstrate a likelihood of success on the merits.