**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

HEATHER FLANARY               :
                                       :
                                       :
     v.                      :        Civil No. CCB-16-3422
                                         :
                                       :
BALTIMORE COUNTY, MARYLAND, *et al.*  :
                                       :
                                       :

## MEMORANDUM

Now pending is a motion for a preliminary injunction. The plaintiff, Heather Flanary ("Officer Flanary"), filed suit against Baltimore County, Maryland; the Baltimore County Police Department; and James Johnson, former chief of police of Baltimore County ("Chief Johnson"), alleging, *inter alia*, that the defendants violated her rights under the Americans with Disabilities Act ("ADA"). (Compl., ECF No. 1). On October 12, 2016, the same day she filed suit, Officer Flanary also moved for a preliminary injunction, (Mot. Prelim. Inj., ECF No. 2), which Baltimore County and Chief Johnson opposed, (Resp. in Opp'n to Mot. Prelim. Inj., ECF No. 4). The court held a hearing on the preliminary injunction motion that spanned three days.[1] For the reasons set forth below, the court will deny the plaintiff's motion for a preliminary injunction.

## BACKGROUND

This case arises out of a traumatic incident that occurred on June 5, 2013. Officer Flanary, a police officer, was attacked while on duty, and her partner shot and killed the assailant in response. (Mot. Prelim. Inj. Mem. Law 2, ECF No. 2-1). Pursuant to standard protocol, Officer Flanary was temporarily taken off full duty, but she was subsequently cleared to return to

---

[1] The motion hearings took place on February 17, 2017; March 2, 2017; and March 21, 2017.

full duty by Dr. Caren DeBernardo ("Dr. DeBernardo"), a consultant for psychological services for the police department. (Resp. in Opp'n to Mot. Prelim. Inj. 5; Hr'g Tr. 285, Mar. 2, 2017). Several months later, on August 27, 2013, Officer Flanary had an emotional reaction to the smell of gunpowder and the sounds of weaponry discharging at a firing range. As a result, she was required to undergo a fitness-for-duty examination with Dr. DeBernardo, which took place on August 29, 2013. (Def.'s Ex. 18, 1). In light of her reaction at the range, Dr. DeBernardo concluded the plaintiff was unfit for full duty as a police officer and recommended that she be assigned to administrative duties and undergo therapy to "cope with the anxiety associated with shooting." (*Id.* 6–7). Dr. DeBernardo did not conclude, however, that Officer Flanary suffered from posttraumatic stress disorder ("PTSD") at that time. (*Id.*; Hr'g Tr. 294, Mar. 2, 2017).

In the wake of the evaluation by Dr. DeBernardo, Officer Flanary was taken off full duty and commenced weekly therapy sessions with a private psychologist, Dr. Samuel Yaffe ("Dr. Yaffe").[2] (Hr'g Tr. 14–15, Feb. 17, 2017). Dr. Yaffe diagnosed her with mild PTSD but cleared her to return to full duty in March 2014. (*Id.* 15; Mot. Prelim. Inj. Mem. Law 3). Officer Flanary then returned to full duty – she was not required to undergo another fitness-for-duty examination at that time – but she nonetheless elected to continue therapy sessions with Dr. Yaffe until July 2014 "to make sure that [she] was okay." (Hr'g Tr. 15, Feb. 17, 2017; Pl.'s Hr'g Ex. 1).

Several months into her therapy sessions, Dr. Yaffe told Officer Flanary that he was not getting paid by the police department, because she had not opened a workers' compensation claim. For that reason, Officer Flanary eventually filed such a claim, stating that she was suffering from lingering symptoms associated with the June 2013 incident. (Hr'g Tr. 22, 47, Feb.

---

[2] There is a dispute over whether the police department ordered Officer Flanary to comply with the recommendation from Dr. DeBernardo that she receive therapy. According to Officer Flanary, the police department never ordered her to attend therapy sessions in 2013. (Hr'g Tr. 14, Feb. 17, 2017). But Chief Johnson testified that the department ordered her to attend therapy sessions in 2013 and that doing so was mandatory.

17, 2017; Mot. Prelim. Inj. Mem. Law 4). In connection with her claim, Officer Flanary was evaluated by two experts, Dr. Patrick Sheehan ("Dr. Sheehan") and Dr. Christiane Tellefsen ("Dr. Tellefson"). In his March 2015 report, Dr. Sheehan concluded that Officer Flanary was fit for duty. However, he also found that she suffered from moderate PTSD, depression, and panic attacks, and he recommended that she attend monthly therapy sessions with Dr. Yaffe for one year. (Def.'s Hr'g Ex. 20, 18; Hr'g Tr. 53–56, February 17, 2017). In her April 2015 report, Dr. Tellefsen also diagnosed Officer Flanary with PTSD, although she stated it was "largely resolved." Despite "lingering irritability and attitude issues," she concluded Officer Flanary had reached "maximum medical improvement" and was "functioning without any occupational impairment from any mental disorder." (Def.'s Hr'g Ex. 21, 10–11). Dr. Tellefsen did not provide any treatment recommendations.[3] At her June 2015 workers' compensation hearing, Officer Flanary testified that she was having nightmares and flashbacks about the June 2013 incident and that she was having trouble sleeping and concentrating and was more irritable. (Resp. in Opp'n to Mot. Prelim. Inj. 6). But she also claimed these lingering symptoms were not affecting her work as a full duty police officer. (Mot. Prelim. Inj. Mem. Law 5).

In September 2015, the department ordered Officer Flanary to meet Dr. DeBernardo for another fitness-for-duty examination. (Hr'g Tr. 58–59, Feb. 17, 2017; Pl.'s Hr'g Ex. 9; Def.'s Hr'g Ex. 1). According to Chief Johnson, the department ordered the examination in light of Officer Flanary's testimony during the workers' compensation hearing several months prior and, in particular, her description of ongoing symptoms like lack of sleep and irritability. These

---

[3] Dr. Tellefsen offered somewhat contradictory testimony as to why she did not include treatment recommendations in her report. At one point, she indicated she did not make recommendations because she believed Officer Flanary was "doing well." But she also testified that she did not make recommendations because she was not asked to do so. (Hr'g Tr. 115–16. Feb. 17, 2017).

symptoms troubled Chief Johnson, because it appeared to undermine his belief that Officer Flanary's mental health had stabilized. Officer Flanary claims she was never told why another examination was necessary, but she opted to cooperate. (Hr'g Tr. 24–25, 59, Feb. 17, 2017).

The examination took place on September 25, 2015. In her ensuing report, Dr. DeBernardo found that Officer Flanary was fit for full duty. However, she also concluded that Officer Flanary suffered from PTSD and "should return to therapy to address irritability, social withdrawal, sleep disturbance, and intrusive thoughts associated with the incident." (Def.'s Hr'g Ex. 1, 7).[4] Addressing the need for more therapy, she wrote: "There is concern that if Ms. Flanary is involved in another traumatic incident on the job . . . her symptoms will increase and her functioning will decrease." (*Id.*). In sum, Dr. DeBernardo wanted Officer Flanary to remain on full duty, partly because "it was important for her self-esteem to continue working," but also believed more therapy would help her deal with the daily stresses of police work. (Hr'g Tr. 312–13, Mar. 2, 2017). In response to an inquiry from Frances Butcher, chief of police personnel for the Baltimore County Office of Human Resources, Dr. DeBernardo then clarified and expanded on her findings in an October 22, 2015, email to Ms. Butcher and others. In particular, she explained that, in her opinion, the referral for further treatment should be mandatory and treatment should occur on a weekly basis for at least four months. She further stated that Officer Flanary should provide letters from her therapist confirming the start of treatment, active participation in treatment at two months, progress with symptoms at four months, and a letter when her therapist believes Officer Flanary no longer required treatment. (Def.'s Hr'g Ex. 2, 1).

---

[4] When evaluating the plaintiff in September 2013, Dr. DeBernardo did not diagnose Officer Flanary with PTSD. According to Dr. DeBernardo, however, Officer Flanary's symptoms had worsened in the intervening two years, such that a diagnosis of PTSD was appropriate in September 2015. (Hr'g Tr. 311, Mar. 2, 2017).

On November 6, 2015, Ms. Butcher met with Officer Flanary and her supervisors. At that meeting, Ms. Butcher provided Officer Flanary with a copy of the September 2015 report from Dr. DeBernardo. She also explained that Officer Flanary was required to restart therapy in order to remain on full duty. (Hr'g Tr. 62, Feb. 17, 2017; Def. Hr'g Ex. 3). And Ms. Butcher provided Officer Flanary with a form – an "Authorization For Release of Confirmation of Compliance with Treatment" – that asked Officer Flanary to agree to three steps. (Def. Hr'g Ex. 4). First, it stated that Officer Flanary would provide a copy of Dr. DeBernardo's latest report to the doctor who would conduct additional therapy sessions with her – presumably Dr. Yaffe. Second, it would have authorized Dr. Yaffe to confirm with Ms. Butcher that Officer Flanary was complying with the recommendations for treatment/therapy contained in the report by Dr. DeBernardo. Third, it would have authorized Dr. DeBernardo "to discuss [Officer Flanary's] treatment and progress" with Dr. Yaffe, "and with Baltimore County's Office of Human Resources personnel, as needed, regarding [Officer Flanary's] fitness for duty." (*Id.*). Officer Flanary opted not to sign this form at the November 6 meeting, because she wanted to review it with her union representative. (Hr'g Tr. 69, Feb. 17, 2017).

After the November 6 meeting, Officer Flanary attended two therapy sessions with Dr. Yaffe, on November 19, 2015, and December 17, 2015. She also faxed a note to her employer from Dr. Yaffe – dated December 17, 2015 – listing these two sessions and stating that she had been "most cooperative." (Def.'s Hr'g Ex. 9; Hr'g Tr. 29, Feb. 17, 2017). But Officer Flanary did not return the authorization form. Ms. Butcher then provided Officer Flanary with a revised authorization form, which she hoped would address any concerns Officer Flanary might have related to the exchange of information between Dr. Yaffe and the police department

contemplated in the original form. (Def.'s Hr'g Ex. 8; Hr'g Tr. 384–86, Mar. 2, 2017). The revised form again stated that Officer Flanary would provide a copy of Dr. DeBernardo's latest report to the doctor who would conduct additional therapy sessions with her – presumably Dr. Yaffe. Second, it would have authorized Dr. Yaffe "to release confirmation of [Officer Flanary's] attendance to scheduled appointments and estimated time frame necessary to complete the recommendations for treatment/therapy, not to include diagnostic and/or clinical information," to Ms. Butcher. Third, it would have authorized Dr. DeBernardo "to discuss [Officer Flanary's] treatment and progress with [Dr. Yaffe], as needed, regarding [her] fitness for duty." (Def.'s Hr'g Ex. 8).

By late January 2016, however, Officer Flanary had not signed and returned either the original or the revised form. As a result, the department issued a written order to Officer Flanary stating that she was required to take six steps in order to remain a full duty police officer. (Def.'s Hr'g Exs. 10, 11). On January 28, 2016, Officer Flanary acknowledged receipt of the order but declined to comply with four of the six conditions, claiming they violated her rights under the ADA. (Def.'s Hr'g Ex. 11).[5] In particular, she declined to (1) authorize the Baltimore County Office of Human Resources to send a copy of the September 2015 report from Dr. DeBernardo to Dr. Yaffe; (2) authorize Dr. Yaffe "to disclose [her] attendance or non-attendance to scheduled appointments and time frame necessary to complete the recommendations for treatment, not to include diagnostic and/or clinical information," to the human resources department; (3) authorize Dr. Yaffe to correspond with Dr. DeBernardo, including to confirm Officer Flanary had initiated treatment, her "active participation" in treatment at two months, her progress with symptoms at four months, and to notify Dr. DeBernardo when Dr. Yaffe believed Officer Flanary had reached

[5] Officer Flanary claimed that she had already complied with the other two conditions. (Def.'s Hr'g Ex. 11, 2).

"maximum improvement in treatment"; and (4) participate in a follow-up evaluation with Dr. DeBernardo as scheduled by human resources. (*Id.*).

Because she refused to comply with the January 2016 order, Officer Flanary was removed from full duty and placed on desk duty, effective February 1, 2016. (Mot. Prelim. Inj. Mem. Law 8; Resp. in Opp'n to Mot. Prelim. Inj. 13). However, her police powers were not suspended. On February 3, 2016, Officer Flanary filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) and sued for emergency injunctive relief in the Circuit Court for Baltimore County. (Mot. Prelim. Inj. Mem. Law. 8–9). The circuit court entered a temporary restraining order ("TRO") that same day barring enforcement of the order, and Officer Flanary was returned to full duty. One week later, however, the circuit court denied her request for a preliminary injunction, and Officer Flanary was again taken off full duty and returned to desk duty. (*Id.* 9).[6] Then, on July 5, 2016, Chief Johnson ordered Officer Flanary to comply with the conditions that had been previously outlined in the January 2016 order within 21 days; failure to do so would result in "disciplinary action." (Def.'s Hr'g Ex. 12). Officer Flanary refused. On August 1, 2016, the department suspended her police powers and placed her on medical light duty, with pay. (Def.'s Hr'g Exs. 13, 14).

At all times relevant here, Officer Flanary performed her official responsibilities with distinction. Chief Johnson awarded her the Silver Star Award in recognition of her "courage, valor and bravery" during the June 2013 incident. (Pl.'s Hr'g Ex. 4). She received a favorable performance review for her work from October 1, 2013, until September 30, 2014, and another favorable review for her work from October 1, 2014, until September 30, 2015. (Pl.'s Hr'g Exs.

---

[6] Officer Flanary subsequently appealed that preliminary injunction ruling. The Court of Special Appeals affirmed the judgment of the circuit court on February 27, 2017. *Flanary v. Baltimore Cnty, Md.*, 2017 WL 750710 (Md. Ct. Spec. App. Feb. 27, 2017).

3, 5). And Officer Flanary was named Officer of the Month for her precinct in January 2015 and then again in October 2015. (Pl.'s Hr'g Exs. 6, 7). In short, she has been an effective police officer.

## LEGAL STANDARD

To win a preliminary injunction, a plaintiff must demonstrate that (1) she is likely to succeed on the merits; (2) she will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in her favor; and (4) the injunction is in the public interest. *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The plaintiff must satisfy each of these four elements and must make a "clear showing" that she is likely to succeed on the merits at trial. *Id.* at 321.

## ANALYSIS

This case centers on two questions. The first is whether a police department may, in certain circumstances, require a police officer to undergo therapy as a condition of remaining a full duty officer even though the officer has been found fit for duty and is performing well on the job. The second is whether a police department may impose conditions related to that therapy by, for instance, requiring a treating physician to correspond with the police department on issues like attendance or progress with symptoms. The court will examine these questions in turn.

A. The Required Therapy Sessions

Officer Flanary claims the police department violated the ADA by requiring her to restart therapy sessions in the fall of 2015. According to Officer Flanary, this mandatory referral was unlawful, because it was not "job-related and consistent with business necessity." (*See* Mot.

Prelim. Inj. Mem. Law 11–15). Under the ADA, an employer may not require an employee to undergo a "medical examination" or "make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability" unless the examination or inquiry is "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).[7] This provision "permits employers to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." *Porter v. U.S. Alumoweld Co.*, 125 F.3d 243, 246 (4th Cir. 1997) (quoting 29 C.F.R. pt. 1630, App. § 1630.14(c)). That is, a "business necessity" exists "where the employer can 'identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties.'" *Coursey v. Univ. of Maryland E. Shore*, 577 F. App'x 167, 173 (4th Cir. 2014)[8] (quoting *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 98 (2d Cir. 2003)). An employer may have legitimate reasons to doubt an employee's ability to perform his or her job duties – and thus lawfully require a medical examination or make disability-related inquiries – even if the employee's job performance has not suffered. *See Leonard v. Electro-Mech. Corp.*, 36 F. Supp. 3d 679, 687 (W.D. Va. 2014);

---

[7] The court assumes, without deciding, that the therapy sessions that Officer Flanary was required to attend in fall 2015 constituted a "medical examination" or disability-related "inquiries" under § 12112(d)(4)(A), such that they are barred unless they are "job-related and consistent with business necessity." The parties have not briefed this issue and did not discuss it in court. Several circuit courts have suggested that counseling constitutes a "medical examination" or disability-related "inquiry" if it is designed to reveal information about an impairment or about an employee's health. *See Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 820 (6th Cir. 2012) (suggesting mental health treatment constitutes a "medical examination" if it is likely to elicit information about a disability); *Karraker v. Rent–A–Center, Inc.*, 411 F.3d 831, 837 (7th Cir. 2005) (concluding an evaluation was a "medical examination" because "it is designed, at least in part, to reveal mental illness and has the effect of hurting the employment prospects of one with a mental disability"); *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 578–80 (6th Cir. 2014) (suggesting disability-related "inquiries" are questions likely to elicit information about a disability). Here, the police department was aware of Officer Flanary's PTSD diagnosis and her symptoms when it referred her to therapy in 2015; indeed, it referred her to therapy in order to address those symptoms. For that reason, it may be that the therapy was designed to treat mental health issues rather than diagnose them. Regardless, the court need not make a formal ruling on this issue. Even if the contested therapy constitutes a "medical examination" or disability-related "inquiry," the referral was lawful because it was "job-related and consistent with business necessity."

[8] Unpublished opinions are cited not for any precedential value but for the soundness of their reasoning.

*Johnson v. Goodwill Ind. of E. North Carolina, Inc.*, 1998 WL 1119856, at *4 (E.D.N.C. Dec. 17, 1998); *see also Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) (a police department need not "forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries"). Whether such legitimate reasons exist is an objective inquiry: employer motivation is irrelevant. *Pence v. Tenneco Auto. Operating Co.*, 169 F. App'x 808, 812 (4th Cir. 2006).

Police departments in particular have somewhat greater leeway under § 12112(d)(4)(A) in light of police officers' unique job responsibilities and their duty to safeguard the public. *See Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 626 (6th Cir. 2014) (suggesting police departments have greater leeway to require mental health examinations, because officers "respond to stressful situations and shoulder responsibility for public safety"); *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146–47 (9th Cir. 2010) (legitimacy of examination was "heavily colored" by the fact that the plaintiff was a police officer); *see also Watson*, 177 F.3d at 935 (police department may require an examination if it "reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional," because it "place[s] armed officers in positions where they can do tremendous harm if they act irrationally"); *Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2000) (police department may require fitness for duty examination upon learning an officer "was experiencing difficulties with his mental health"); *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1312 (11th Cir. 2013) (employer may require medical examination "if it has information suggesting that an employee is unstable and may pose a danger to others"); *cf. Blake v. Baltimore Cty., Md.*, 662 F. Supp. 2d 417, 422 (D. Md. 2009) ("Public safety is one of the core concerns of any police department and taking steps to ensure it is both 'job related and consistent

with business necessity.' Similarly, taking steps to ensure the safety of fellow officers meets the statutory test."). Accordingly, police departments may order medical examinations if they have good reason to doubt an officer's ability to respond appropriately to "extremely stressful and dangerous situations." *See Brownfield*, 612 F.3d at 1146–47.[9]

In November 2015, the Baltimore County Police Department had good reason to doubt that Officer Flanary would respond appropriately to such "extremely stressful and dangerous situations." Five months before, Officer Flanary had testified that she continued to endure symptoms associated with the June 2013 incident, including nightmares, flashbacks, increased irritability, and difficulty sleeping and concentrating. These symptoms persisted more than one year after Officer Flanary had ended therapy sessions with Dr. Yaffe, and medical experts agreed that she suffered from PTSD. Dr. Sheehan had found that Officer Flanary also suffered from depression and panic attacks. Chief Johnson worried, reasonably, that these ongoing symptoms might present safety or legal issues. For some individuals with PTSD, symptoms never remit completely, (Hr'g Tr. 133, Feb. 17, 2017), but that does not mean Chief Johnson's concerns about these symptoms were illegitimate. *See Leonard*, 36 F. Supp. 3d at 687 ("An employer cannot be expected to understand the symptoms or ramifications of the medical conditions of its employees and must be allowed to have such conditions examined by a medical professional.") (quoting *Johnson*, 1998 WL 1119856, at *4). And the fact that Officer Flanary had performed well since returning to full duty in March 2014 is not dispositive. *See id.*

Concerning the need to restart therapy, the department had received contradictory views. Dr. Sheehan had recommended that Officer Flanary restart therapy while Dr. Tellefsen had

---

[9] An employer may also require a medical examination, or make disability-related inquiries, if objective evidence exists that an employee is a "direct threat." *See, e.g.*, *Kim v. MedImmune, Inc.*, 2004 WL 3313219, at *2–3 (D. Md. Aug. 17, 2004), *aff'd*, 122 F. App'x 41 (4th Cir. 2005). Because it is not necessary to do so, the court does not analyze the present facts under the direct threat framework.

found her mental health issues were "largely resolved." After considering all of this information and conducting her own in-person evaluation, Dr. DeBernardo concluded Officer Flanary needed to restart therapy, partly to ensure public safety. (Hr'g Tr. 312, Mar. 2, 2017) ("[M]y concern was that the symptoms of irritability, sleep disturbance, with the nightmares and the daily intrusive thoughts needed to be addressed in terms of public safety . . . . I wanted to have her go to treatment to address those symptoms so that we can be sure that the public was safe and to shore up her resources."). Although Dr. DeBernardo found Officer Flanary fit for duty, she also concluded that therapy should be required. These expert opinions, coupled with Officer Flanary's own statements concerning her symptoms, gave the department "legitimate, non-discriminatory reasons to doubt" that Officer Flanary could perform her duties – including responding to stressful situations – without continued therapy.[10]

Officer Flanary's arguments to the contrary are unconvincing. She claims there is no objective basis to doubt whether she could fulfill her duties, because (1) medical experts had found she was fit for duty, and (2) she had performed well on the job since returning to full duty in March 2014. That interpretation of the ADA, and the actions it permits employers to take, is unduly narrow. Under § 12112(d)(4)(A), the issue is whether an employer has legitimate reasons to doubt that an employee, particularly a public safety employee, can safely perform his or her job duties. That is why an employer may lawfully require a medical examination or make

---

[10] A separate issue in this case is whether the requirement that Officer Flanary undergo the fitness-for-duty evaluation with Dr. DeBernardo in September 2015 was "job-related and consistent with business necessity." The court does not address this issue, because it appears that Officer Flanary does not challenge this order. In her motion for preliminary injunction, for instance, Officer Flanary objects to unspecified "medical inquiries" to which she was subjected but also suggests the order to undergo the September 2015 fitness-for-duty examination was not unlawful. (*See* Mot. Prelim. Inj. Mem. Law 14) (claiming the September 2015 evaluation "should have been the end of the analysis and the campaign" by the police department). At the motion hearing, plaintiff's counsel further clarified that Officer Flanary was not challenging the 2015 fitness-for-duty evaluation. Although counsel claimed the fitness-for-duty evaluation was a "questionable medical inquiry," she then stated, "It doesn't matter. That's not an issue. Officer Flanary agreed to submit to it because she knew she was fit and she wanted to stay on the job." In any event, the court finds the September 2015 evaluation was not unlawful, for many of the same reasons discussed above.

disability-related inquiries even if the employee's job performance has not suffered. *See Leonard*, 36 F. Supp. 3d at 687. With respect to the opinion of medical experts, merely noting that all doctors found Officer Flanary fit for duty ignores important differences in their conclusions. By finding that Officer Flanary had reached "maximum medical improvement," Dr. Tellefsen suggested continued therapy was unnecessary.[11] Dr. DeBernardo, on the other hand, concluded Officer Flanary could remain on full duty – partly because she worried that removing her might harm her mental health, (Hr'g Tr. 312, Mar. 2, 2017) – but further concluded the department should require her to undergo therapy to safeguard the public by ensuring Officer Flanary responded appropriately in emergency situations. In general, employers may require medical examinations or make disability-related inquiries when faced with contradictory medical opinions. *See Leonard*, 36 F. Supp. 3d at 686–87 (concluding an employer could request a medical examination partly because the employee's doctor had provided "seemingly conflicting opinions" regarding whether the employee was fit for duty); *see also Michael v. City of Troy Police Dep't*, 808 F.3d 304, 309 (6th Cir. 2015).[12] That is especially true here, where the department was responsible with ensuring the safety of Officer Flanary, her fellow police

---

[11] The court notes that Dr. Tellefsen did not testify that employers should never make continued therapy a condition of employment. In fact, she testified that Dr. DeBernardo's recommendation that Officer Flanary return to therapy while still on full duty was reasonable. (Hr'g Tr. 112–14, Feb. 17, 2017) ("I think that it certainly is within the realm of reasonable. I have made recommendations for somebody to stay in treatment as a condition of employment.").

[12] According to Officer Flanary, the part of Dr. DeBernardo's 2015 report in which she states that Officer Flanary would likely benefit from therapy amounts to mere "medical dicta" that follows "an unqualified finding that [Officer Flanary] had no occupational impairment and was fit for duty." (Pl.'s Post-Hearing Correspondence, ECF No. 21, 2). This argument is not persuasive. After reading Dr. DeBernardo's report, Ms. Butcher was uncertain whether Dr. DeBernardo had concluded that the police department should require Officer Flanary to restart therapy. For that reason, she asked Dr. DeBernardo to clarify this part of her report, and Dr. DeBernardo replied that, in her expert opinion, further therapy should be required. (Def.'s Hr'g Ex. 2). In these circumstances, the court does not see how the police department could or should have felt free to disregard this part of the report as mere "dicta." Indeed, when considering the report and subsequent clarification from Dr. DeBernardo, the police department could reasonably conclude its own medical expert had recommended making therapy a condition for remaining on full duty.

officers, and the general public. *See Blake*, 662 F. Supp. 2d at 422 ("Public safety is one of the core concerns of any police department.").[13]

More broadly, Officer Flanary also suggests an employer can never "compel an employee to submit to medical or mental health treatment as a condition of employment." (Mot. Prelim. Inj. Mem. Law 10). This argument is not supported by the case law. *See Kroll*, 763 F.3d at 623–24 (suggesting employer may require an employee to undergo counseling if counseling is "job-related and consistent with business necessity"); *Dengel v. Waukesha Cty.*, 16 F. Supp. 3d 983, 994 (E.D. Wis. 2014) (finding the requirement that an employee participate in employee assistance program (EAP) counseling sessions and receive a return-to-work authorization was "job-related and consistent with business necessity"); *cf. Mickens v. Polk Cnty. Sch. Bd.*, 430 F. Supp. 2d 1265. 1275–81 (M.D. Fla. 2006) (no ADA violation in case where employer directed employee to get counseling through an EAP and requested a psychological evaluation); *Jaques v. Herbert*, 2006 WL 2472982, at *1, 13 (N.D. Ohio Aug. 24, 2006) (suggesting mandatory compliance with a drug treatment program as a condition of employment may be "job-related and consistent with business necessity").

Relatedly, Officer Flanary claims the mandated therapy was not "job-related and consistent with business necessity" in light of various conditions the department outlined in its January 2015 order related to that therapy. For instance, she suggests the order required her to waive her right to medical confidentiality, because it required her to authorize her therapist to confirm her attendance at therapy sessions and required her to allow that therapist to discuss

---

[13] The plaintiff notes that a preliminary injunction was granted in *Blake* and suggests the present case is similar. (*See* Pl.'s Additional Authority, Ex. 2, ECF No. 12-2) (submitting opinion granting preliminary injunction in *Blake* as additional authority for the court to consider). In *Blake*, however, a police officer was ordered to undergo a fitness for duty examination ten years after suffering a seizure, even though there was no evidence that the officer had suffered any symptoms or seizures in the intervening time. The case here is distinguishable, in part because Officer Flanary testified in June 2015 that she was currently experiencing symptoms. In addition, unlike in *Blake*, two medical experts here had concluded that Officer Flanary should restart therapy to address ongoing symptoms.

aspects of her progress with Dr. DeBernardo. She also suggests the order undermined her ability to craft a treatment plan with her therapist by requiring that therapist to provide updates at two and four months, thereby implicitly requiring treatment to last for at least four months.[14]

These claims are meritless. Under the ADA, medical examinations and disability-related inquiries must be limited in scope such that they focus on whether an employee can perform his or her job and are no broader or more intrusive than necessary. *See Porter*, 125 F.3d at 246; *Allen v. Baltimore Cty., Md.*, 91 F. Supp. 3d 722, 737–38 (D. Md. 2015) (employer-ordered medical examinations must be restricted to discerning if an employee can perform his or her job); *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) (request for a medical examination or inquiry must be "no broader or more intrusive than necessary"); *Conroy*, 333 F.3d at 98 (same); *cf.* 42 U.S.C. § 12112(d)(4)(B) (explicitly permitting employers to "make inquiries into the ability of an employee to perform job-related functions"). The conditions outlined in the January 2015 order are sufficiently restricted in this regard. With respect to medical confidentiality, the department had found that therapy was needed to ensure Officer Flanary could do her job, and the conditions ask the treating provider to confirm Officer Flanary is attending and making progress in therapy, without revealing diagnostic or clinical information. Under the ADA, employers may mandate such limited releases of medical information. *See Thomas*, 483 F.3d at 528 (request for "a limited portion" of employee's medical records for purposes of a medical examination was "no broader or more intrusive than necessary" because records were needed to

---

[14] These objections related to medical confidentiality and alleged employer interference in treatment are not clearly outlined in Officer Flanary's motion for preliminary injunction. At the motion hearing, however, plaintiff's counsel alluded to them repeatedly. For instance, plaintiff's counsel claimed that one issue in this case was whether a police department can order an officer "to undergo medical inquiries, including a waiver of medical confidentiality." Similarly, plaintiff's counsel asked the court to decide whether the police department may "compel an employee who's performing exceptionally to sign a medical records release and permit, requiring her to permit invasion of her medical and mental health confidentiality." With respect to employer interference, counsel claimed that any treatment plan should be the domain of the treating physician and suggested the department had wrongly interfered in treatment by requiring Officer Flanary to attend therapy for at least four months.

determine fitness for duty); *Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778, 783–84 (N.D. Ohio 2002) (employer may make limited demands for employee medical records if doing so is "job related and consistent with business necessity"); *cf. Krocka*, 203 F.3d at 515 (where inquiries into the mental health of an employee are job-related and reflect a concern with employee safety, an employer may, in certain circumstances, "require specific medical information from the employee"). With respect to employer interference with treatment plans, the conditions authorize Officer Flanary's therapist to discuss "progress with symptoms" at four months but do not explicitly require therapy to last that long and do not dictate a course of treatment. (*See* Hr'g Tr. 320, Mar. 2, 2017). In any event, this requirement was suggested by Dr. DeBernardo and is limited to the issue of whether Officer Flanary was controlling her symptoms to such an extent that she could respond to respond to emergency situations while on the job. And requiring an employee to confirm attendance with therapy sessions is not an overbroad disability-related inquiry, nor is it unusual. (Hr'g Tr. 107, Feb. 17, 2017).[15]

B. Post-Therapy Fitness-for-Duty Evaluation

The January 2016 order also required Officer Flanary to "[p]articipate in a follow up [sic] evaluation with Dr. DeBernardo" after completing renewed therapy sessions. (Def.'s Hr'g Ex. 10, 2). According to Dr. DeBernardo, this "evaluation" would be a full fitness-for-duty

---

[15] Officer Flanary also suggests a 2012 consent decree in *United States v. Baltimore County, Maryland*, 12-2327-WDQ, is relevant in this case. (*See* Pl.'s Additional Authority, Ex. 3, ECF No. 12-3) (submitting copy of consent decree as additional authority). Nothing in that consent decree changes the court's conclusions, partly because the consent decree tracks the statutory language and case law discussed here. For instance, the consent decree states that all medical examinations and disability-related inquiries must be "job-related and consistent with business necessity," and clarifies that Baltimore County can meet this standard by "showing that it has a reasonable belief, based on objective evidence, that an incumbent employee's current ability to perform essential job functions with or without an accommodation is being impaired by a medical condition." (*Id.* 7). With respect to the scope of such examinations or inquiries, the consent decree states that any medical information "elicited or collected from any source for use in any medical examination or inquiry must be limited in scope to exploring the medical condition only to the extent necessary to confirm (a) the individual's ability to perform the essential functions of his or her job, with or without a reasonable accommodation, or (b) whether the individual poses a direct threat." (*Id.* 7–8).

examination. (Hr'g Tr. 320, Mar. 2, 2017). The parties provided no detailed briefing on why this aspect of the order in particular violates the ADA. In court, however, plaintiff's counsel claimed this part of the order violated the ADA: the department, she argued, cannot mandate a future medical examination, because "the inquiry into whether you're entitled to [require] it is at the time, based on present conditions of employment and medical conditions." If Officer Flanary were to comply with all other aspects of the January 2016 order, and if Dr. Yaffe (or some other therapist) were to then certify to the police department that she had reached "maximum improvement in treatment," it is unclear (at least at this point) how the department could still have a legitimate basis for doubting that she can fully perform her job duties. On the other hand, the court is not inclined to grant a preliminary injunction based on speculation as to whether a legitimate basis will exist at some indefinite point in the future, if and when Officer Flanary completes renewed therapy sessions.[16] And, perhaps more to the point, the court fails to see how Officer Flanary will suffer "irreparable harm" absent an injunction barring the department from scheduling a follow-up evaluation, to take place at some point in the future.

### C. Retaliation & Coercion

Officer Flanary also claims the department is liable for unlawful retaliation and coercion under the ADA. In particular, she claims that, after she refused to comply with the January 2016 order, the department retaliated against her by assigning her to desk duty. She also claims the department then stripped her of police powers and relegated her to performing civilian clerical

---

[16] Confusingly, the July 5, 2016, order – which gave Officer Flanary 21 days to comply with the January 2016 order or else face "disciplinary action" – required Officer Flanary to contact Ms. Butcher in order to schedule a follow-up evaluation with Ms. Butcher. (Def.'s Hr'g Ex. 12). That follow-up evaluation, however, presumably would not take place until after Dr. Yaffe or another treating provider concluded that Officer Flanary had reached "maximum improvement" with respect to her mental health. Accordingly, it is unclear what Officer Flanary could actually schedule at this point even if she wished to comply fully with the police department orders.

functions in an attempt to "coerce" her to comply with that order. (Mot. Prelim. Inj. Mem. Law 15–16). Neither claim has merit. With respect to retaliation, the ADA provides, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To prevail on a claim for retaliation, a plaintiff has two options: she "must either offer sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting method." *Rhoads v. FDIC,* 257 F.3d 373, 391 (4th Cir. 2001). Under the first option, a plaintiff must produce evidence that the employer intended to discriminate against her. *See id.* 391–92. Alternatively, a plaintiff may proceed under the burden-shifting framework. There, a plaintiff must first make out a *prima facie* case of retaliation by showing "(1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action." If an employee satisfies this burden, her employer must articulate a legitimate, non-retaliatory reason for its action. If the employer does so, the plaintiff must prove the employer's articulated reason is pretext. *Id.* 392.

Officer Flanary is unlikely to prevail on the merits of her retaliation claim. The police department lawfully required Officer Flanary to comply with certain conditions in order to remain on full duty. When Officer Flanary refused to comply, she was removed from full duty. The evidence indicates the police department removed her from full duty because it believed that failure to enforce its order could endanger public safety and expose the department to legal liability – not because Officer Flanary had claimed the order violated the ADA. Accordingly, the retaliation claim is unlikely to prevail, because the department had a legitimate, non-retaliatory

reason for its action, which Officer Flanary has not shown to be pretext. Indeed, the department appears willing to return Officer Flanary to full duty if she complies with its orders.

With respect to coercion, the ADA provides, "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b). The Fourth Circuit has not clearly articulated how § 12203(b) applies, and the parties have not briefed this issue. However, it appears a burden-shifting framework applies under both § 12203(a) and § 12203(b). *See Bertolotti v. Prunty*, 2010 WL 3743866, at *3 (S.D. W.Va. Sept. 21, 2010); *see also Silk v. City of Chicago*, 194 F.3d 788, 799 (7th Cir. 1999); *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001).

Under that framework, the plaintiff cannot show the requisite likelihood of success. Officer Flanary claims the police department attempted to coerce her, because, several months after she had refused to comply with the January 2015 order and had been taken off full duty, the department stripped her of police powers and relegated her to performing civilian clerical functions. (Mot. Prelim. Inj. Mem. Law 15). But Chief Johnson testified that he initially removed Officer Flanary from full duty but nonetheless retained her police powers, because he was trying to balance competing concerns. On the one hand, he worried about her mental health and whether that could pose safety or legal concerns. On the other, he recognized that she was a good officer and did not want to take "overbearing" action against her. By the summer of 2016, however, he was worried that Officer Flanary retained full police powers and was armed, yet had taken no steps to comply with the January 2016 order and had not provided any updates regarding her mental health or restarted therapy sessions. For that reason, he believed she still

"presented potential for great risk and certainly liability," even when not on full duty. In July 2016, Chief Johnson gave Officer Flanary another three weeks to obey the department order and, when she declined to do so, he stripped her of police powers. The evidence thus indicates that the department had legitimate reasons to act as it did and was not trying to "coerce" Officer Flanary.

## CONCLUSION

The court is sympathetic to Officer Flanary and her plight. By all accounts, she is an effective police officer, and she has worked hard and served with distinction even in the wake of an extremely traumatic event. But the court must apply the law, and the ADA protects employers as well as employees. Here, the police department had a legitimate basis to doubt that Officer Flanary would respond adequately in emergency situations. She continued to experience symptoms related to the traumatic event years after the event occurred. Although medical experts found her fit for duty, two experts urged her to continue therapy in order to address lingering symptoms. The department's own expert had urged the department to make such therapy mandatory. In such a situation, the ADA does not bar a police department from requiring continued therapy as a condition for full-duty status, especially in light of the dangerous and stressful situations that police officers are likely to encounter. Because Officer Flanary has failed to make a "clear showing" that she is likely to succeed on the merits of her claim, her request for a preliminary injunction necessarily fails.

Even if the court were to reach the other prongs of the preliminary injunction test, it is not clear that the balance of harms weighs in favor of Officer Flanary or that an injunction would serve the public interest. Police officers are entrusted with protecting the communities in which they serve and can do great harm if they respond inappropriately in emergency situations. For

that reason, it may be in the public interest to provide the police department with greater flexibility to ensure its full-duty officers are fully equipped to handle the many difficult situations they face.

Accordingly, the court will deny the motion for a preliminary injunction. A separate order follows.


5/11/17
Date

               /s/
Catherine C. Blake
United States District Judge